**In re FOUR STAR MUSIC CO., INC., Debtor.**

**PIPPIN WAY, INC., Plaintiff,**

v.

**FOUR STAR MUSIC COMPANY, INC., Irwin A. Deutscher, Receiver, Defendants.**

**Bankruptcy No. 77–30484.**

United States Bankruptcy Court, M. D. Tennessee.

Nov. 29, 1979.

Thomas P. Kanaday, Jr., Nashville, Tenn., for Pippin Way (Deutscher).

William Lamar Newport, Nashville, Tenn., for Irwin A. Deutscher, receiver.

James William Lincoln, Nashville, Tenn., for William A. McCall.

G. Rhea Bucy, Nashville, Tenn., for Four Star Music, debtor.

## MEMORANDUM AND ORDER

PAUL E. JENNINGS, Bankruptcy Judge.

On February 21 and 22, 1979, trial was held before this Court on plaintiff's Complaint to Modify the Stay imposed by this Court and to reclaim the copyrights, royalties and other interests in and derived from certain musical compositions known as the Four Star Music Catalog. The issues presented were three: (1) Whether the transaction between Pippin Way and First American Bank constituted a sale as defined by T.C.A. § 47–2–106; (2) whether Pippin Way purchased the Four Star Music Catalog at a "commercially reasonable" sale as defined by T.C.A. § 47–9–504; and (3) whether Pippin Way was a good faith purchaser for value at that sale.

The following shall constitute finding of facts and conclusions of law pursuant to Rule 752, F.R.B.P.

### I.

On August 25, 1975, in order to secure a loan of $250,000, Four Star Music Company, Inc. (Four Star) granted First American National Bank (Bank) a security interest in certain "royalties, payments, and other monies" derived from the exploitation of the common law and/or statutory rights to mechanically reproduce certain musical and dramatico-musical compositions, comprising the Four Star Music Catalog (Catalog). The Catalog encompasses all of the musical compositions owned by Four Star Music Company, Inc., the copyrights on those compositions, and all contract and other rights inherent in or arising out of the ownership of those compositions and copyrights.

Sometime prior to April 1976, the Bank had also loaned money to J & J Enterprises, a joint venture, to construct a building on Music Row in Nashville on the security of a deed of trust covering the building and the land upon which it was being erected. Joe E. Johnson, President of Four Star, was a member of J & J Enterprises. On June 29, 1976, Four Star granted the Bank a security interest in the Catalog itself and in all rights arising out of the Catalog, in exchange for the extension of time to repay all indebtedness to the Bank, including that of J & J Enterprises.

These transactions were handled by D. R. Crants as an officer of the Bank and its division, Guaranty Mortgage Company. Crants had graduated from West Point and received a joint business and law degree from Harvard. At the time the Bank had employed Crants and at the time of the transaction in question, Crants testified the Bank was experiencing some financial difficulties and it was important that large loans not be perceived as having large losses. One goal of Crants and the Bank was to reduce the large amount of foreclosed property which the Bank was holding.

In September, the Bank determined that Four Star had breached its agreement with the Bank and declared the indebtedness of Four Star to be in default. In anticipation of foreclosure under the Four Star security agreement, Crants contacted a Nashville attorney, H. McKinley Marlow, to prepare an independent appraisal of the Four Star Catalog to satisfy the Bank's independent auditors. Crants learned of Marlow's appraisal and of its apparent low valuation of the Catalog and he asked Marlow not to put his findings in writing as he did not want to forward a possibly unsatisfactory appraisal to Peat, Marwick & Mitchell, the Bank's independent auditors.

Instead Crants developed an "appraisal" of his own, using figures "received from the borrower (in) a letter signed by a man named John Beanstalk". The Bank never obtained a reliable independent appraisal of the Catalog.

In September and October, Crants had a number of conversations with various people relative to sale of the Catalog. All such conversations were initiated by the prospective purchasers. Crants never actively solicited offers from people who might be expected to have an interest in the Catalog. Among those who sought out Crants and discussed the Catalog was Wesley Rose, a director of the Bank and head of Acuff-Rose Publications. Ivan Mogul, Dave Burgess, and Bobby Russell also contacted Crants.

Mary Reeves Davis, active in the music publishing business for many years, contacted William Greenwood, vice-chairman of the Board of Directors of the Bank, and indicated interest in the Catalog. Mr. Greenwood relayed this information to Crants. Mrs. Davis unsuccessfully attempted on numerous occasions to reach Crants. Crants testified he decided not to return her calls "because I didn't think that she had the mental strength that would be necessary to see this purchase through." Richard Frank attempted to contact Crants on behalf of Acuff-Rose Publications over a period of six weeks to two months.

The proof establishes that on each of these occasions Mr. Crants either did not respond to the calls of the prospective buyer or told the person to pursue the purchase with Four Star. (Four Star had requested that the Bank let it attempt to find a purchaser for the Catalog).

On November 30, 1976, First American National Bank conducted a foreclosure sale of the Four Star building. By letter of November 9, 1976, the Bank also gave notice to Four Star of the private sale of the Catalog on or after December 1, 1976.

As of late 1976, Crants had no direct experience at all with the music industry nor with the sale of Music Catalogs. Crants never employed any experienced person to develop a marketing strategy nor to conduct the sale of what admittedly was highly unique collateral. Only a limited number of purchasers would be interested in a Music Catalog. The condition of the Catalog and the claims outstanding against it indicated that it was not readily marketable. Included were a perfected security interest by Commerce Union Bank for $225,000, a lawsuit by William A. McCall alleging ownership in a portion of the Catalog, a claim by Lavinia Johnson, and possible claims by songwriters having compositions in the Catalog.

Pippin Way, plaintiff herein, having learned of the impending sale, contacted the Bank and after discussions offered to purchase the Catalog for one million dollars, evidenced by a promissory note in that principal amount payable to the Bank. The legal counsel for the Bank prepared a Pur-

chase and Sale agreement. However, at the time of closing Mr. Crants, Mr. Beasley, president of Pippin Way and Mr. H. McKinley Marlow (who was now representing Mr. Beasley) prepared an Addendum which was substituted for part of the original agreement.[1] Under the Addendum the corporation was solely responsible for the debt and no personal endorsement was required. As a term of the purchase the buyer obtained an absolute right to rescind the agreement by delivering the Catalog to the Bank at any time within one year of the sale. Additionally, Four Star was given thirty days from date of sale in which to repurchase its Catalog.

Richard Frank, a Nashville attorney with twenty years experience in the field of entertainment law, testified that he has represented clients on eight or ten occasions, both in the selling and purchasing of catalogs of copyrighted compositions, each involving a price of $100,000 or more. On other occasions Frank has been employed by lending institutions to give a formal opinion as to the value of such catalogs and is familiar with the customary methods employed in the industry in selling or merchandising music catalogs. According to Frank, a transaction such as that effected by the Bank and Pippin Way is "highly unusual".

Crants never requested nor received a personal financial statement from William Beasley, president and sole stockholder of Pippin Way. Beasley was never given an appraisal of the Four Star Catalog. Nor had he investigated the full extent of the liens outstanding against the Catalog. Crants never requested nor received a financial statement from Pippin Way. He never requested nor received any documentation authorizing the purchase of the Catalog by Beasley on behalf of Pippin Way.

Pippin Way had been incorporated on December 1, 1976, and a charter filed with the Secretary of State of Tennessee. See Exhibit 12. On December 2, 1976, Beasley had subscribed for 1,000 shares of Pippin Way stock for $1000 but did not pay for the stock until December 20, 1976. This was the first deposit of any money to any account of Pippin Way. This amount was reduced to $90 by the end of December, 1976. Mr. Beasley has been involved in the initial incorporation of various companies prior to the incorporation of Pippin Way.

During 1977 some $359,000 was advanced to Pippin Way by the Bank. Of that amount, $225,000 was used to pay off the Commerce Union Bank lien. From January through June, 1978, the Bank loaned $8,000 a month to Pippin Way. Pippin Way never made any payments on the one million dollar note to the Bank. The monthly operating statements which the Purchase and Sale agreement required be furnished to the Bank were never formally submitted. The stock certificate was never given to the Bank as required by the Purchase and Sale agreement. So far as the record reflects, Pippin Way never recorded the Bill of Sale with the Register of Copyrights in Washington, D. C.

On March 29, 1977, Four Star commenced these proceedings by filing an original petition under Chapter XI of the Bankruptcy Act. Irwin A. Deutscher was thereafter appointed receiver and qualified as such.

---

1. Addendum A, contained the following provisions, among others: Seller agrees, however, that any obligations or liabilities from Buyer to Seller which may arise or be claimed, under this entire agreement and any collateral agreements, shall be the obligation solely of buyer corporation, and no officer, director, stockholder, or agent of buyer corporation assumes or makes any personal warranties, guaranties, or endorsements as to any such agreements.

4. The following is added to the agreement as section 9, immediately following the above (section 8) language: Buyer may at any time during the one year term immediately following the date of this agreement, elect to rescind all its obligations to seller hereunder (and under any collateral agreements) upon redelivery of the assets of the Four Star Catalog as of that date, if in its sole discretion the claims against, and state of, the corporation and catalog are such that Buyer does not consider it possible to profitably operate and exploit the Four Star Catalog. In this event, Buyer shall have no further obligations of any nature whatsoever to Seller.

## II.

The first issue presented is whether there was in fact a sale of the Music Catalog by First American to Pippin Way. T.C.A. § 47–2–106 [made applicable to Article 9 transactions by § 47–9–105(3)] defines a sale as "the *passing of title* from the *seller* to the *buyer* for a *price*." (emphasis added). The Court will examine each of these elements in turn.

The actual transfer of title to the Catalog is unclear. The one-page Bill of Sale which Pippin Way attached to its complaint bears no notice that it was recorded, as required by 17 U.S.C. § 205, with the Register of Copyright in Washington, D. C. Nor does the security agreement from Pippin Way to First American contain notice of compliance with federal copyright registration. No other testimony as to transfer was given. However, location of title is not of major importance since T.C.A. § 47–9–101 states that title to the collateral is not determinative of the rights, obligations and remedies under Article 9.

The position of First American as seller cannot be attacked since its right to repossess the collateral after default is not questioned. The position of Pippin Way as buyer, however, is not above reproach. Pippin Way was incorporated December 1, 1976, as a vehicle to effect the purchase of the Four Star Music Catalog. T.C.A. § 48–204 requires that:

"A corporation shall not transact any business, conduct any affairs or incur any indebtedness except such as shall be incidental to its organization, or, in the case of a corporation for profit, incidental to obtaining subscriptions to or payment for its shares until: (a) The charter has been filed by the secretary of state, and

(b) If a corporation for profit, there has been received the amount stated in the charter as being the minimum amount of consideration to be received for its shares before commencing business."

The transaction between Pippin Way and First American took place December 9 although the minimum capital was not actually paid in until December 20.

Corporations are creatures of law and can come into existence only in the manner prescribed by law. Since Pippin Way, at the time of the purported sale, had not complied with the requirements of T.C.A. § 48–204, it was not a de jure corporation. At best it was a *de facto* corporation.

"To constitute a de facto corporation there must be a bona fide attempt to incorporate and organize a corporation under the law; and this includes at least a bona fide attempt to comply with the conditions precedent prescribed by the statute and a colorable compliance therewith."

18 C.J.S. Corporations § 45; *see also* 1 Fletcher Cyclopedia Corporations §§ 129, 3777. The Tennessee rule is that *de facto* corporations are "those which have made a bona fide effort to comply with the provisions of law and have inadvertently failed in some particular, and in good faith have exercised the franchises of such corporation." *Cunnyngham v. Shelby,* 136 Tenn. 176, 181, 188 S.W. 1147, 1149; *Paper Products Co. v. Doggrell,* 195 Tenn. 581, 261 S.W.2d 127 (1953). A *de facto* corporation has been found where a defect existed in the acknowledgement of corporate papers, *Tenn. Automatic Lighting Co. v. Massey,* 56 S.W. 35 (Tenn.Ch.App.1899), or where a general membership meeting was held instead of an organizational meeting, *Duck River Preservation Ass'n v. Tennessee Valley Auth.,* 410 F.Supp. 756 (E.D.Tenn.1974). *See also Crouch v. Gray,* 154 Tenn. 521, 290 S.W. 391 (1926). The delay in paying in the minimum capital coupled with the withdrawal of all but $90 of the one thousand dollars within eleven days after deposit is seen as neither a good faith effort to comply nor an inadvertent failure. Mr. Beasley had been involved in the initial incorporation of other companies and cannot claim to be inexperienced with the formalities required.

An examination of the price involved reveals that the parties agreed to one million dollars in the form of a promis-

sory note, cancellable at will by Pippin Way, no money down and no security other than a lien on the Catalog itself. Since consideration is necessary to make a binding contract for sale, the giving or promising of something, whether called price or consideration, is an essential element of a sale. Although the Uniform Commercial Code defines *value,* it does not define *price* or *consideration.* Hence, it is necessary to apply general principles of law to determine what constitutes consideration. 1 R. Anderson, The Uniform Commercial Code § 2–106:3 (2d ed. 1970).

Generally a promise may constitute sufficient consideration for a sales contract. "A contract of sale is mutual where it contains an agreement to sell on the one side and an agreement to purchase on the other; but it is not mutual where there is an obligation to sell but no obligation to purchase . ." 77 C.J.S. Sales § 20, p. 608. *See Oak Distributing Co. v. Miller Brewing Co.,* 370 F.Supp. 889 (E.D.Mich.1973); *Bendix Home Appliances v. Radio Accessories Co.,* 129 F.2d 177 (8th Cir. 1942).

 "Provisions in a contract of sale which in effect nullify or negative the obligation of either the buyer or the seller and render it illusory and not enforceable deprive the contract of mutuality . . ." 77 C.J.S. Sales § 20, p. 616. Thus a contract with an arbitrary right or option to cancel lacks mutuality and is unenforceable. Unless this right of cancellation is supported by independent consideration, a contract with an unrestricted right of rescission is invalid. 17 C.J.S. Contracts § 100(6). A promise that does not put any limitation on the freedom of the alleged promisor but leaves his future action subject only to his own will is illusory. It is not enforceable against the one making it nor operative as a consideration for a return promise. A. Corbin on Contracts § 145, p. 211. *R. A. Weaver & Associates, Inc. v. Asphalt Const. Inc.,* 190 U.S.App.D.C. 418, 587 F.2d 1315 (D.C. 1978); *Barton v. Bechtel Corp.,* 253 F.Supp. 288 (N.D.Cal.1965).

In analyzing a contract with such a power to cancel or rescind, *Corbin* makes the following suggestions.

"In drawing a contract containing a power to cancel or other option in a promisor, special care should be taken to see that the contract expresses a clear and undoubted consideration given by this promisor for any return promise. If the promise with an option is the only consideration given for a return promise, make sure that the option is limited in some substantial way and is made to appear so; make sure that the promise is not illusory, but promises something substantial in any event. Let there be some executed payment or other executed performance in fact made and not merely recited. If there is an 'option to cancel', draw the provision so that the exercise of the option will not affect the option holder's executed performance and will not result in his getting something for nothing or in the other party's losing everything that he expected to gain by the transaction." A. Corbin on Contracts, § 160, at p. 234.

 Whether a bona fide sale has been made depends not upon the form of the transaction but upon its substance. *Higgins v. Smith,* 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940). This matter is before the Court upon the complaint of Pippin Way for reclamation of property in the hands of the trustee. Pippin Way, thus, has the burden of establishing affirmatively its right to possession by proving ownership of such property. 4A Collier on Bankruptcy § 70.-39[3]. In the instant case Pippin Way had the unqualified right "in its sole discretion" to "rescind all its obligations to seller" and have "no further obligations of any nature whatsoever to Seller". The Court finds that the absolute and unqualified right of Pippin Way to rescind all its obligations under the contract of sale and any collateral agreements renders its promise illusory and inoperative as consideration for a binding contract. Therefore, the transaction between Pippin Way and First American does not qualify as a sale under T.C.A. § 47–2–106.

Although there was an assertion that the Bank gave unconditional credit to Four

Star for the one million dollars involved in the sale, the documents themselves do not so specify. The Bank was not a party to this litigation and there was no testimony showing that such an amount was actually credited.

## III.

■ Assuming, however, that there had been a sale of the Catalog by First American, the Court would be required to determine if there has been a commercially reasonable sale.[2] A commercially reasonable sale is tested by the procedures employed for sale rather than the proceeds received. T.C.A. § 47–9–507; *In Matter of Zsa Zsa, Ltd.,* 352 F.Supp. 665 (S.D.N.Y.1972); *In re Nellis,* 22 UCCRS 1318 (E.D.Pa.1977).

The procedure to be followed is outlined in T.C.A. § 47–9–507(2)

". . . If the secured party either sells the collateral in the·usual manner in any recognized market therefor or if he sells at the price current in such a market at the time ·of his sale or *if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner."* (emphasis added.)

T.C.A. § 47–9–504(3) provides that

"Disposition may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but *every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable . . ."* (emphasis added.)

■ Such procedure must be followed since the debtor cannot waive any of his rights or any of the duties of the creditor (secured party). T.C.A. § 47–9–501(3) requires

"To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied . . ."

The statute then lists the rules which may not be waived, including "subsection (3) of § 47–9–504 and subsection (1) of § 47–9–505 which deal with disposition of collateral . . ."

Although the statute has not attempted to define the parameters of the term "commercially reasonable", case law has specified six factors by which the statute requirements may be measured:

(1) the type of collateral involved; and

(2) the condition of the collateral; and

(3) the number of bids solicited; and

(4) the time and place of sale; and

(5) the purchase price received or the terms of sale; and

(6) any special circumstances involved.

*See Mercantile Financial Corp. v. Miller,* 292 F.Supp. 797 (E.D.Pa.1968); *Franklin State Bank v. Parker,* 136 N.J.Super. 476, 346 A.2d 632, 18 UCCRS 266 (1975); *Associates Finance v. Teske,* 190 Neb. 747, 212 N.W.2d 572, 14 UCCRS 283 (1973); *Commercial Credit Corp. v. Wollgast,* 11 Wash. App. 117, 521 P.2d 1191, 14 UCCRS 1498 (1974); *Luxurest Furniture Manufacturing Co. v. Furniture Warehouse Sales, Inc.,* 15 UCCRS 546 (1974).

Case law is unanimous in stating that commercial reasonableness requires that "the disposition of the collateral be made in keeping with the prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or similar business." *Mallicoat v. Volunteer Finance & Loan Corp.,* 57 Tenn.App.

---

**2.** No question exists but that Four Star received reasonable notification of the private sale. Notice was sent to the debtor on November 19, 1976, announcing that a private sale of the Catalog would be conducted on or after December 1, 1976. The sale was not accomplished until December 9, 1976, some twenty days subsequent to the issuance of notice to the debtor. Also, as a condition of the sale, Pippin Way purchased the Catalog subject to the right of Four Star to refinance and repurchase the Catalog at any time within thirty days subsequent to the sale. Thus, Four Star was given fifty days notice prior to the actual forfeiture of its rights in the Catalog.

462

106, 415 S.W.2d 347 (1966) at 350; *U. S. v. Willis*, 593 F.2d 247 (C.A. 6th Cir. 1979); *Mercantile Financial Corp. v. Miller, supra.*

The collateral in the instant case is a Music Catalog encompassing all of the musical compositions owned by Four Star Music Company, the copyrights on those compositions, and all contract and other rights inherent in or arising out of the ownership of those compositions and copyrights. It is admitted by all the parties that the collateral is unique and as such is of interest to a limited number of purchasers.

The Courts have had opportunity to examine the concept of commercial reasonableness in the context of disposition of unique collateral. In upholding the sale of common stock of a radio station, the court emphasized that the secured party had gotten a competent appraisal from an experienced and highly reputable "media broker" who had made over two hundred appraisals in his career. The secured party had thoroughly investigated different types of sales and had relied upon expert and experienced advice. *Old Colony Trust Company v. Penrose Industries Corp.,* 280 F.Supp. 698 (E.D. Pa.1968). In examining the sale of an airplane, the court refused to find a commercially reasonable sale where the seller "did not advertise or otherwise make normal and reasonable contacts within the industry to dispose of the aircraft." *Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337 F.Supp. 659 (W.D.Okl.1972) at 663. The sellers in *Dynalectron* did not advertise the aircraft for sale in any of the customary trade journals or publications. They did not show the aircraft or do any work to make it more attractive. They contacted only one of five or six operators who conceivably could use the plane. They contacted only one aircraft broker and did not place the plane with him for sale.

Failure to advertise in trade and commercial journals, failure to employ a professional auction company, and utilization of an attorney from the bank who was inexperienced in auction sales led the court to find that the sale of oil drilling equipment did not meet the requirement of a commercially reasonable sale since the bank's procedures were not in conformity with practices among oil field equipment dealers. *Liberty National Bank & Trust Co. of Okla. City v. Acme Tool, etc.,* 540 F.2d 1375 (10th Cir. 1976).

Sale of a Sabreliner 60 executive jet aircraft was scrutinized in *Connex Press, Inc. v. International Airmotive, Inc.,* 436 F.Supp. 51 (D.C.1977). The seller there was aware that the logical potential buyers of such an aircraft were dealer groups but made no effort to contact them and stimulate their interest although this is the accepted practice in normal commercial sales of this type of used aircraft. The seller had a mailing list and sales force but used neither. Although advertisements were placed in the Wall Street Journal and Trade-a-plane, "both ads were written in matter of fact, cautious terms that in no way encouraged buyer interest." *Id.* at 55. The court concluded that the sale was not commercially reasonable.

Failure to follow prevailing practices in the particular industry led the court to conclude that the sales of equipment of a publishing company and a two-way communication system were commercially unreasonable. In the former the court found that the seller had made no genuine effort "to reach the market best able to use the equipment" since he failed to notify regional and national printing equipment dealers and place ads in national trade publications and other regional publications. *U. S. v. Conrad Publishing Co.,* 589 F.2d 949 (8th Cir. 1978) at 954. In disposing of the two-way communication system designed especially for the debtor's particular needs, the seller's only efforts to encourage bidding was through the local newspaper. Mailing lists were not utilized nor was advertising placed with trade journals or electronics publications. *Associates Capital Serv. Corp. v. Riccardi,* 454 F.Supp. 832 (D.R.I.1978).

 It is obvious that in disposing of unique collateral the secured party must make significant attempts to reach the most logical purchasers. Richard Frank testified that the most likely purchasers of

a music catalog would be the major publishing companies, operating on a national or multi-national level. No attempts were made to reach any of these potential buyers. No trade publications were utilized nor were professionals employed. The Bank relied solely on a network of informal communications in the local music community. Even local prospects were not actively cultivated. The basic information which should be made available to potential buyers was not accumulated. According to Mr. Frank, the publisher's net royalties for preceding accounting periods, a list of compositions in the catalog and the particular licenses and uses to which they had been put in the past, a list of the various recordings which had been made of each composition by label and by entertainer, together with any extraneous encumbrances on the catalog or particular positive attributes of the catalog are all facts necessary for meaningful negotiations. Yet the Bank acquired none of this information and neglected even to obtain an independent appraisal. Under these facts the court finds that the Bank did not make adequate preparation or proceed in a commercially reasonable manner in accord with the prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or similar business.

It is true that in this case the encumbered condition of the collateral and impending litigation made the Catalog less attractive to potential purchasers. This merely underscores the need for an adequate appraisal in order to ascertain the true value. The *Connex* court dealt with this very problem in considering the circumstances of the sale of the executive jet formerly owned by Robert Vesco. Because the plane had a clouded history, was not in top operating condition and doubts existed about the title, the court recognized that a greater burden was placed upon the seller. That does not excuse the creditor from the obligation to perform his duty in good faith and in a commercially reasonable manner. *Connex Press, Inc. v. International Airmotive, Inc., supra.*

The number of bids solicited was minimal. This was due to the failure to contact the most logical buyers, as has been previously discussed. Apparently the music industry was conceived as being within the perimeters of Nashville, Tennessee, although the facts of the case indicate that the Bank, acting through D. R. Crants, was not even familiar with recognized names within this locale.

The court is unable to comment upon the validity or reasonableness of the price obtained for the Catalog since there was never an appraisal made or a statement of value from an independent source. As noted earlier, this is not a major consideration in testing the commercial reasonableness of a sale. However, the terms of the sale bear scrutiny. A promissory note was given for the full purchase price. No earnest money or option price was requested. No requirement that Pippin Way account to First American for earnings or profits received during the one year period was imposed even though Pippin Way had unrestricted freedom to rescind the contract and cancel all obligations. According to Mr. Frank, such terms are not the prevailing practice in the sale of a music catalog. Indeed, those terms were not the terms included in the documents drafted by counsel for the Bank.

Rather than viewing in isolation specific details of the sale of the debtor's collateral, it is the aggregate of circumstances in each case which should be emphasized in reviewing the sale. The elements of manner, method, time, place and terms cited by the Uniform Commercial Code are to be viewed as necessary and interrelated parts of the whole transaction. *In the Matter of Zsa Zsa, Ltd., supra; C.I.T. Corp. v. Lee Pontiac, Inc.,* 513 F.2d 207 (C.A. Idaho 9th Cir. 1975). In this instance the aggregate of circumstances indicates that the sale of the Music Catalog to Pippin Way does not meet the standard of commercial reasonableness when tested by the prevailing trade practices in the music industry. The failure to utilize the methods designed to reach the most likely purchasers, failure to employ

professionals trained in developing a marketing strategy or merchandising such unique collateral, failure to look beyond the local business community, combined with usual terms highly beneficial to the buyer represent a clear divergence from the accepted standards of commercial reasonableness.

## IV.

Although the Court has concluded that the transaction between Pippin Way and First American was not a commercially reasonable sale, the Uniform Commercial Code provides that a bona fide purchaser for value will take clear title from a faulty sale. T.C.A. § 47–9–504 provides as follows:

"(4) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this Part or of any judicial proceedings . . . if the purchaser acts in good faith."

Comment of official text (4) [47–9–504] "Where the purchaser for value has bought at a private sale he must, . . . qualify in all respects as a purchaser in good faith."

■■■■ Thus, if Pippin Way is a good faith purchaser for value, it will take free of all of the debtor's rights in the collateral. "In order to constitute a buyer a bona fide purchaser, he must have parted with a valuable consideration; and a failure in this respect prevents his obtaining the protection extended to such purchasers." 77 C.J.S. Sales § 290. The consideration involved was the one million dollar promissory note, cancellable at will by Pippin Way. There was no security beyond the collateral itself, no deposit, no personal liability or endorsement. The court earlier has reached the conclusion that the consideration was illusory and insufficient to create a binding contract. Additionally, it is to be noted that "The giving of a note constitutes a

valuable consideration within the bona fide purchaser rule only if the instrument in question is negotiable." 77 C.J.S. Sales § 290b(2).

T.C.A. § 47–2–103(1)(b) defines good faith in the context of a merchant as follows:

" 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

The Purchase and Sale agreement, executed by Beasley as president of Pippin Way contains the following statement:

". . . Buyer represents that it is a sophisticated merchant who employs representatives who deal commonly with music catalogues, copyrights, and interests therein, . . .

Buyer is a duly authorized and acting Tennessee corporation and the execution of this Agreement and all the agreements contemplated or deemed necessary by Seller pursuant hereto are within the scope of its corporate authority, and duly authorized by proper corporate actions, and such authorizations are and will continue in full force and effect."

Pippin Way, as a merchant, did not conduct its affairs with honesty in fact. It made affirmative misrepresentations in connection with the transaction with First American. Pippin Way represented itself to be an existing corporation duly authorized to conduct business and to enter into the agreement. In actuality, Pippin Way did so in violation of T.C.A. § 48–204 since the minimum capital had not been paid in.

■■■■ The requirement for qualifying as a good faith buyer depends upon the commercial status of the purchaser. If the buyer is a merchant, he is chargeable with the knowledge or skill of a merchant. *Mattek v. Malofsky*, 6 UCCRS 277 (Wis.1969). One dealing in the business should be held to a higher degree of sophistication than the ordinary individual buying for his personal use. Practices standard in the trade and well known can not be ignored in good faith. *Swift v. J. I. Case*, 11 UCCRS 190

(Fla.1972). As discussed earlier, the terms of the purchase and sale were so highly unusual and beneficial to the buyer that Pippin Way, as a merchant and chargeable with the knowledge and skill of a merchant, cannot in good faith have believed that they were commercially reasonable. Therefore, the court finds that Pippin Way is not a good faith purchaser for value and as such does not take clear of the debtor's rights in the collateral.

## V.

The complaint must be dismissed.

Proceedings involving the intervening petition of William McCall were continued pending resolution of this matter. Those proceedings are set for trial January 25, 1980. The parties are directed to file pretrial briefs on or before January 15, 1980.

It is so ORDERED.