Atlas MF Mezzanine Borrower, LLC v Macquarie Tex. Loan Holder LLC (2019 NY Slip Op 04495)





Atlas MF Mezzanine Borrower, LLC v Macquarie Tex. Loan Holder LLC


2019 NY Slip Op 04495


Decided on June 6, 2019


Appellate Division, First Department


Kapnick, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 6, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman, J.P.
Judith J. Gische
Barbara R. Kapnick
Marcy L. Kahn
Cynthia S. Kern, JJ.


651657/17 7877 

[*1]Atlas MF Mezzanine Borrower, LLC, etc., Plaintiff-Respondent,
v
Macquarie Texas Loan Holder LLC, etc., et al., Defendants-Appellants.



Defendants appeal from an order of the Supreme Court,
New York County (Charles E. Ramos, J.), entered April 18, 2018, which denied their motions to dismiss the complaint as against them.




Dechert LLP, New York (Gary J. Mennitt, Daphne T. Ha and Kevin Brost of counsel), for Macquarie Texas Loan Holder LLC, appellant.
Quinn Emanuel Urquhart & Sullivan LLP, New York (Sanford I. Weisburst and Andrew J. Rossman of counsel), for KKR Repa AIV-2 L.P. and KRE LRP Osprey Venture LLC, appellants.
Meister Seelig & Fein LLP, New York (Stephen B. Meister, James M. Ringer and Benjamin D. Bianco of counsel), for respondent.



KAPNICK, J.


Article 9 of the Uniform Commercial Code (UCC) governs the enforcement of a creditor's security interest. "The underlying purposes and policies of the [UCC] as a whole are to simplify, clarify, and modernize the law governing commercial transactions; to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and to make uniform the law among the various jurisdictions" (95 NY Jur 2d, Secured Transactions § 2 Purpose). Here, plaintiff Atlas MF Mezzanine Borrower, LLC (Atlas), the [*2]debtor, is asking this Court to unwind a UCC sale of the equity interest in 11 commercial properties, which was collateral for Atlas's $71 million mezzanine loan, borrowed from defendant Macquarie Texas Loan Holder LLC (Macquarie), the secured creditor. It is difficult to see how such an action would simplify the laws governing commercial transactions. Rather, if UCC sales could be unwound, it would only serve to muddy the waters surrounding nonjudicial sales conducted pursuant to article 9 of the UCC, and to deter potential buyers from bidding in nonjudicial sales, which would, in turn, harm the debtor and the secured party attempting to collect after a default. Moreover, and as explained in detail below, Atlas's argument does not have support in the plain reading of the UCC nor in existing case law.
BACKGROUND
I. The Loan and Subsequent Default
Atlas Apartment Holdings, LLC, the parent company of Atlas, and its related affiliates, are developers and operators of multi-family housing throughout the United States. According to the complaint, in December 2013, Atlas purchased 11 apartment complex properties, all located in Texas, and worth approximately $240 million. Each property was financed by a separate loan insured by the United States Department of Housing and Urban Development (HUD). Atlas contends that the balance of the 11 HUD mortgage loans is approximately $140 million. Atlas purchased the properties through its wholly-owned subsidiary, Atlas MF Holdco, LLC (the Holding Company). Each of the apartment properties is owned by a special purpose entity, and all 11 of the special purpose entities are owned by the Holding Company, which in turn is owned by Atlas.
In late December 2013, in order to finance its purchase of the 11 apartment properties, Atlas obtained a mezzanine loan for $71 million from Macquarie [FN1]. The mezzanine loan was meant to be a short term loan that matured on January 2, 2017, with Atlas having the option to exercise two one-year extensions. As collateral for the mezzanine loan, Atlas pledged its equity interest in the Holding Company.
Atlas intended to pay off the mezzanine loan by refinancing it at the end of the initial term, as opposed to exercising its option to extend the loan for an additional year. However, in late December 2016, it became apparent that Atlas would need more time to finalize the terms of the refinancing. Atlas asked Macquarie for a forbearance, and Macquarie agreed to a short period. Thereafter, Macquarie sent Atlas a draft forbearance agreement. According to Atlas, the agreement was unacceptable because it violated the applicable HUD rules and regulations listed in the HUD mortgage documents. The parties exchanged additional draft forbearance agreements, but were unable to agree on the necessary terms.
On January 3, 2017, Macquarie issued a notice of default and demand for payment. On January 11, 2017, Macquarie sent Atlas a "Notification of Disposition of Collateral," which set forth the proposed terms of a nonjudicial public sale of "[o]ne hundred percent (100%) of the limited liability company interests in Atlas MF Holdco, LLC."
II. The Nonjudicial Sale
Macquarie established a virtual data room, and interested bidders could apply to register to bid at the sale, which would give them access to the posted documents. On January 18, 2017, Macquarie posted a draft purchase and sale agreement; it was not the final draft, however, and was subject to Macquarie's right to make changes without notice to potential bidders. Macquarie posted a revised draft on February 6, 2017, and a further revised draft on February 25, 2017, still [*3]subject to further changes before the sale.
On February 15, 2017, Macquarie began publicly advertising the sale in the Real Estate Alert and the Wall Street Journal. The sale was scheduled to take place on February 27, 2017, at a private law office in New York City.
Under the terms of the sale, which were set by Macquarie, Macquarie maintained the right to, after the auction, reject all bids received in the auction and reschedule the auction without publishing the new date of the sale; to impose any other commercially reasonable conditions upon the sale of the collateral as Macquarie may deem proper; and to require any winning bidder to either pay off the HUD mortgage loans within 21 days or obtain HUD's approval to assume the HUD mortgage loans within 96 days. If the winning bidder chose to pay off the HUD mortgage loans, then a $4.125 million deposit was due on the day of the auction. The bidder was then required to pay off the HUD mortgage loans and close on the purchase of the Holding Company within 21 days, or else the bidder forfeited the deposit. If the winning bidder chose to assume the HUD mortgage loans, it would need to post a deposit in the amount of $8.25 million, which would be forfeited if HUD failed to approve or reject the application to assume the HUD mortgage loans within the 96 day period. Moreover, Macquarie's terms required the winning bidder to execute the sale and purchase documents on the date of the auction; however, final drafts of the sale and purchase documents were not disclosed in advance.
On February 17, 2017, Atlas, through an affiliate, submitted a bidding certificate to register to bid at the sale. Macquarie rejected the certificate because it failed to include certain language. Atlas then submitted a new bidding certificate under its own name, which included the particular language that was missing from the previous bidding certificate. However, Atlas alleges that Macquarie changed the bidding certificate requirements after Atlas's bid submission, to impose a new requirement that Atlas submit evidence of its ability to tender payment for its bid before being permitted to register to bid.
Thereafter, Atlas provided proof of its ability to bid at the sale by submitting a term sheet from a lender for a loan that exceeded the full amount of the debt. Between February 24th and February 26th, Atlas and Macquarie engaged in discussions regarding the proof of payment requirement. On February 26, 2017 (a Sunday), after 4:00 p.m., Macquarie finally informed Atlas that it would be permitted to bid at the sale. At that point, Atlas had minimal time to obtain the required cashier's check that, under the terms of the sale, it would have to present for deposit if it was the winning bidder.
On the day of the sale, four bidders appeared at the auction: Macquarie, Atlas, defendant KKR REPA AIV-2 L.P. (KKR) and nonparty Sandalwood Management, Inc, which did not end up bidding at the sale. KKR started the bidding at $50 million, to which Atlas responded with a bid of $50.25 million. Macquarie rejected Atlas's bid on grounds of ineligibility because Atlas had not presented the required deposit check. Macquarie then credit bid $73.5 million as the secured lender. KKR increased its bid to $73.75 million. Atlas responded with a bid for $74 million, which was initially rejected. Atlas argued that Macquarie's terms required a check at the conclusion of the sale, not at the beginning, and, therefore, Macquarie was improperly rejecting Atlas's bids. Thereafter, Macquarie accepted Atlas's $74 million bid. The bidding process continued, and KKR's last bid was for $76.75 million, to which Atlas responded with a bid of $77 million. Macquarie ended up rejecting Atlas's last bid and accepting KKR's bid as the winning bid, based on the bidder's demonstrated ability to close.
On May 3, 2017, Macquarie purported to transfer ownership of the Holding Company to KKR, which then transferred its interest in the apartment complexes to KRE LRP Osprey Venture LLC (KRE), a company formed by KKR. On May 4, 2017, Macquarie sent Atlas a Notice of Settlement of Disposition of Pledged Equity and Accounting, stating that Macquarie was holding the surplus proceeds from the sale in the amount of $836,891.45. In the same [*4]notice, Macquarie also stated that it had incurred over $1.3 million in attorneys' fees. To date, Macquarie has not paid any of the surplus to Atlas.
III. The Federal Action
On February 14, 2017, prior to Atlas securing a bidding certificate enabling it to participate in the auction, and prior to the commencement of the auction, Atlas filed a lawsuit against Macquarie in the Southern District of New York seeking a preliminary injunction to enjoin the sale, which application was denied on February 22, 2017, after a hearing. The court noted that "what is being sold here is Atlas's equity interest in Holdco. Where a Plaintiff's interest in the real estate is commercial, and the harm it fears is the loss of its investment, as opposed to loss of its home or a unique piece of property in which it has an unquantifiable interest,' such losses are ordinarily compensable by damages, and do not necessarily amount to an irreparable harm as a matter of law'" (Atlas MF Mezzanine Borrower, LLC v Macquarie Texas Loan Holder, LLC, 2017 WL 729128, *3, 2017 US Dist LEXIS 25838, *7-8 [SD NY Feb. 23, 2017], quoting SK Greenwich LLC v W-D Grp. (2006) LP, 2010 WL 4140445, *3, 2010 US Dist LEXIS 112655, *8 [SD NY Oct. 21, 2010]). Thus, the court found that "[b]ecause Atlas has failed to demonstrate irreparable injury that cannot be redressed through a monetary award, it cannot obtain a preliminary injunction" (Atlas MF Mezzanine Borrower, LLC v Macquarie Texas Loan Holder, LLC, 2017 WL 729128, *4, 2017 US Dist LEXIS 25838, *9). The court also rejected Atlas's argument that the terms of the sale were not commercially reasonable as required by NY UCC 9-610(b), instead finding persuasive the fact that no other prospective bidder had complained about the terms of the sale.
IV. Plaintiff's Causes of Action in its First Amended Complaint
A. Declaratory Judgment
In its first cause of action, against Macquarie, KKR and KRE, Atlas seeks a declaration that
"(1) Macquarie did not have the authority to reject Atlas' high bid at the Sale; (2) Macquarie did not have the authority to accept KKR's low bid over Atlas' high bid at the Sale; (3) Macquarie's rejection of Atlas' high bid and acceptance of KKR's low bid was invalid and void; (4) the Sale has not yet been concluded and must be rescheduled and conducted on commercially reasonable terms; (5) Macquarie does not have the legal authority to transfer ownership of the Holding Company to KKR or KRE; (6) Macquarie's purported transfer of ownership of the Holding Company to KRE was invalid, void and of no effect; (7) the Sale was conducted in a commercially unreasonable manner and (8) the Terms of Public Sale were commercially unreasonable. . ."
In sum and substance, Atlas is seeking a declaration that the auction was conducted in a commercially unreasonable fashion, and that the sale can and should be unwound.
B. Violation of UCC 9-610
The second cause of action, solely against Macquarie, is for a violation of section 9-610 of the New York UCC, which requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable" (UCC 9-610[b]). Atlas alleges that Macquarie violated this provision, and as a result of this violation, Atlas "has suffered damages, including, but not limited to, the loss of the value of the Holding Company, loss caused by Atlas' inability to obtain alternative financing, . . . damage to Atlas' reputation, and damage to relations with Atlas' employees, customers, vendors, lenders and investors."
Pursuant to UCC 9-615(f), Atlas argues that it is "entitled to recover the difference in the amount of proceeds that would have been realized had Macquarie conducted the Sale in a [*5]commercially reasonable manner and the amount of proceeds that were realized from the Sale." Further, pursuant to UCC 9-625(a), Atlas seeks "permanent injunctive relief setting aside the Sale and restraining Macquarie from attempting to transfer ownership of the Holding Company to KKR and/or KRE."
C. Tortious Interference with Contract
Atlas's third cause of action for tortious interference with contract against KKR is based on the allegations that KKR encouraged and induced Macquarie to conduct a commercially unreasonable sale and auction process in violation of its contractual duties to Atlas. Atlas contends that "KKR was fully aware that the Sale and auction process for the Sale was commercially unreasonable and designed to wrongfully seize Atlas' equity interest in the Holding Company." Moreover, according to Atlas, "[b]ut for KKR[ s] assistance, cooperation and inducement, Macquarie would not have been able to complete its scheme to conduct a commercially unreasonable UCC Sale. . . ."
D. Civil Conspiracy
The fourth cause of action is for civil conspiracy against KKR and Macquarie and is based on the allegation that KKR and Macquarie "entered into an agreement to ensure that Macquarie conducted a commercially unreasonable sale. . . and to tortiously interfere with the Mezzanine Loan Documents." E. Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing
The fifth and sixth causes of action allege that Macquarie breached the Mezzanine Loan agreement, and the duty of good faith and fair dealing, by conducting a commercially unreasonable sale.
F. Violation of UCC 9-615
The seventh cause of action is pleaded in the alternative and asks that if the court "does not issue a declaratory judgment finding that the Sale has not yet been concluded and must be rescheduled," then Macquarie must turn over the surplus proceeds from the sale to Atlas.
G. Punitive Damages
In addition to a claim for monetary damages of not less than $30 million incurred as a result of Macquarie's and KKR's alleged wrongful conduct and a claim for the surplus, Atlas also seeks punitive damages. PROCEDURAL POSTURE
Defendants separately moved to dismiss the complaint. The motion court denied the motions, and disagreed with defendants' position that pursuant to the UCC a sale cannot be set aside if the transaction has closed. Further, the motion court found that the complaint was valid on its face. Defendants appealed. DISCUSSION I. Declaratory Judgment as to the Validity of the Sale
"Overall, the aim of the Code is to encourage parties to resolve their disputes amicably" (107 NY Jur 2d, Uniform Commercial Code § 2, Purpose of the Code). The Code provides the avenues parties may take to redeem a debt and to protect their rights during and after the disposition process, as well as remedies in the event a secured party does not comply with the Code.
In its First Amended Complaint, Atlas seeks to have the sale declared invalid and void because Macquarie had no legal right to transfer the Holding Company to KKR/KRE and, [*6]therefore, Atlas remains the owner of the collateral [FN2]. In its brief, Atlas focuses primarily on the alleged bad faith conduct of KKR and Macquarie in support of its request for a declaration that the sale is invalid and void, and points to UCC 9-617 and principles of equity as a basis for its claim that the Court has the power to recognize Atlas's rights in the property and to order the sale unwound and the property returned. However, Atlas's interpretation of UCC 9-617 is incorrect.
UCC 9-617, Rights of Transferee of Collateral, details the effect of a secured party's disposition of the collateral after default [FN3]. Specifically, a disposition "(1) transfers to a transferee for value all of the debtor's rights in the collateral; (2) discharges the security interest under which the disposition is made; and (3) discharges any subordinate security interest or other subordinate lien" (UCC 9-617[a][1]-[3]). The section also addresses "good-faith transferee[s]" and "other transferee[s]" in terms of the transferee's rights after disposition. If the transferee acts in good faith, then it takes the collateral "free of the rights and interests [of the debtor] even if the secured party fails to comply with this article or the requirements of any judicial proceeding" (UCC 9-617[b]). However, if the transferee is something other than a "good-faith transferee," it takes the collateral subject to "the debtor's rights in the collateral" (UCC 9-617[c][1]).[FN4]
Atlas contends that the language in UCC 9-617, "subject to the debtor's rights in the collateral," means that the debtor, in the case of a bad faith transferee, retains its ownership interest in the collateral, and/or entitlement to the collateral, which in turn means that a court may set aside the sale as void and invalid, and return the collateral to the debtor. In other words, a transferee who did not act in good faith does not take clear title.
Atlas relies on O'Brien v Chase Home Fin., LLC (42 AD3d 344 [1st Dept 2007]) to support its interpretation of UCC 9-617; its reliance, however, is misplaced. First, the sale in O'Brien had not yet closed when the plaintiff brought his motion to vacate and annul the nonjudicial sale and restrain the defendants from closing on the sale and effectuating any transfer of the stock and proprietary lease during the pendency of the action. Second, the O'Brien Court did not point to any section of the UCC that allows for a sale to be unwound, after closing. Third, the O'Brien Court's reversal of the motion court's denial of the plaintiff's motion to vacate and annul the sale simply remanded the case for further proceedings to determine if the defendants had acted in a commercially reasonable manner, pursuant to UCC 9-610. Lastly, the O'Brien Court did not discuss or cite to UCC 9-617, the section relied upon by plaintiff here in support of its argument in favor of unwinding the sale.
Atlas's reliance on two other cases, In re Hamilton (197 BR 305 [Bankr. ED Ark 1996]) and In re Four Star Music Co., Inc. (2 BR 454 [Bankr. MD Tenn 1979]) likewise is misplaced. [*7]Both are bankruptcy court cases and arise in the context of a bankruptcy court's statutory power to order the turnover of property. More importantly, neither case actually stands for the proposition that, pursuant to UCC 9-617, a UCC sale can be unwound. In Hamilton, the plaintiff sought turnover of his airplane from the defendants, obligors of the underlying loan. After the plaintiff had defaulted on his payment to the bank, which held a security interest in the airplane, the defendants paid the loan, obtained a bill of sale from the bank, and took possession of the airplane. The court determined that while the defendants had exhibited a lack of good faith in the purchase of the airplane, the defendants had actually purchased a security interest in the airplane and not the airplane itself. Therefore, the court found that the defendants held a secured claim in the bankruptcy case, but were not the owners of the airplane. The court then ordered the defendants to turn over the airplane. While the court did cite to UCC 9-617's predecessor (UCC 9-507), it did not unwind a sale pursuant to that section.
Similarly, in Four Star Music, the bankruptcy court did not unwind or invalidate a sale. Rather, the bankruptcy court found that the transaction at issue, the sale of copyrights, royalties and other interests in and derived from certain musical compositions, departed from accepted standards of commercial reasonableness, so much so that the transaction did not even qualify as a sale under Tennessee law. The court noted that the transfer of title to the music catalog was unclear. Moreover, the buyer (the movant seeking the return of the collateral from the trustee) never made any payments on the promissory note given as consideration for the music catalog. The court then considered, assuming there had been a sale, whether the "sale" was commercially reasonable and whether the buyer acted in good faith. In other words, the court's discussion of good faith versus bad faith purchasers and the effect on title to the collateral was dicta. Despite Atlas's argument to the contrary, it cannot be said that either bankruptcy court equated a finding that the debtor retained some rights in or to the collateral with a finding that a court has the power, pursuant to UCC 9-617(c), to declare the sale invalid and void.
Although UCC 9-617 discusses the rights of transferees, both good faith and otherwise, it does not touch on the remedies available to the debtor in the case of a "bad faith" transferee. At most, the language of UCC 9-617 that Atlas focuses on can be read to mean that the debtor, in the case of a commercially unreasonable sale that also involved a transferee that falls into the category of "other transferee," may still exercise some rights in the collateral, such as the redemption right (see UCC 9-623; see also Mitchell v BankIllinois, 316 BR 891, 898 [Bankr. SD TX 2004] [finding that "[a] debtor's rights in repossessed collateral include the right to notification before the disposition of the collateral; the right to any surplus from the disposition of the collateral; and the right to redeem the collateral"] [internal citations omitted]). The Code itself does not expand upon what is meant by "subject to the debtor's rights," but, considering that UCC 9-617 does not deal with remedies for wrongdoing, rather addressing the rights of the transferee of the collateral, here, KKR, it would be a stretch to interpret the language as providing a court with the authority to unwind a concluded UCC sale.
Our interpretation of UCC 9-617 is further supported by an analysis of UCC 9-625, which does address the remedies available to a debtor when a secured party fails to comply with article 9. The section provides for injunctive relief "[i]f it is established that a secured party is not proceeding in accordance with this article," and permits a court to "order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions" (UCC 9-625[a]). Money damages are available "in the amount of any loss caused by a failure to comply with this article" (UCC 9-625[b]).
The availability of injunctive relief depends on the status of the collateral. "By its plain terms, in order for an aggrieved party to obtain injunctive relief, section 9-625(a) requires that the secured party presently be proceeding in a manner that is not in accordance with article 9" (Rapillo v CitiMortgage, Inc., 2018 WL 1175127, *8, 2018 US Dist LEXIS 35491, *21 [ED NY [*8]March 5, 2018]). Courts have interpreted this language to mean that the sale must not have taken place in order for injunctive relief to be awarded (see In re Enron Corp., 2005 WL 3873890, *10, 2005 Bankr LEXIS 3469, 31-32 [Bankr SD NY June 16, 2005] [finding that "[u]nder a plain meaning of the statute, (UCC 9-625[a]) would be applicable in circumstances where the secured party is proceeding to dispose of the collateral and not in a situation where the disposition of the collateral has already occurred"]). The Enron Court stated further that because the sale of the collateral had already occurred in the case before it, the aggrieved party's remedy "would be an action for damages under section 9-625(b) of the UCC and not an invalidation of the sale"(id.)[FN5]. Stated otherwise, a debtor may seek to enjoin the sale, which is exactly what Atlas sought to do in its federal action, before the sale occurred. However, after disposition of the collateral, a debtor may seek money damages, as an offending party "is liable for damages in the amount of any loss caused by a failure to comply with [article 9]" (UCC 9-625[b]). This is the available remedy to Atlas at this stage, and, in fact, Atlas specifically seeks monetary damages in its demand for relief. It may not, after dissolution and conclusion of the sale, unwind the sale, even if a court were to find that KKR was a bad-faith transferee.
Therefore, the first cause of action seeking a declaration invalidating and setting aside the sale must be dismissed as a matter of law, because this remedy is not provided for in the UCC. The remaining portion of the first cause of action seeking a declaration that the sale was conducted in a commercially unreasonable manner is also dismissed, as duplicative of Atlas's second cause of action for a violation of UCC 9-610 (see Singer Asset Fin. Co., LLC. v Melvin, 33 AD3d 355, 358 [1st Dept 2006]["plaintiff may not seek a declaratory judgment when other remedies are available . . ."]). Thus, the first cause of action for a declaratory judgment is dismissed in its entirety. B. Commercially Reasonable
UCC 9-610, Disposition of Collateral After Default, authorizes a secured party, after default, to "sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing" (UCC 9-610[a]). Further, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable" (UCC 9-610[b]). The Code defines a commercially reasonable disposition as one that is made "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the [*9]disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition" (UCC 9-627[b]).
Atlas argues that Macquarie violated UCC 9-610 by imposing unreasonable terms prior to the auction and in conducting the auction in a commercially unreasonable manner. Specifically, Atlas alleges that Macquarie, by not publicly advertising the sale until February 15, 2017, gave potential bidders a mere two weeks to learn of the sale and conduct due diligence. This time frame was wholly inadequate, according to Atlas, because the sale involved 11 separate properties, each with its own attendant HUD loan and HUD documents, as well as the necessary documents pertaining to each special purpose entity, which owned the individual properties. This, in turn, resulted in each property having a complicated business and financial operation that required time to understand and review. Atlas alleges that it is impossible that an independent, noncollusive potential bidder would have been able to conduct the requisite due diligence in such a short period of time.
Atlas alleges further that Macquarie attempted to deprive Atlas of its right to bid at the sale by subjecting it to ever-changing requirements before Atlas was permitted to participate in the auction. Additionally, multiple drafts of the loan documents were distributed close to the date of the sale, and, a final version was not provided until after the sale. Moreover, according to Atlas, Macquarie's rejection of Atlas's bid as the high bidder was commercially unreasonable.
Atlas contends that Macquarie and KKR "colluded and cooperated long before the Sale to orchestrate the transfer of the Apartment Properties from Atlas to KKR, and to loot and then divide up Atlas' equity in the Apartment Properties." Atlas alleges further that the auction was rigged and that Macquarie, with KKR's knowledge, intended to declare KKR the winning bidder, despite the fact that KKR did not make the highest bid. According to Atlas, it is inconceivable that at the auction, KKR did not "make an additional bid on the Holding Company, which had a value net of debt of more than $100 million" unless KKR and Macquarie had acted in bad faith and rigged the sale. Moreover, Atlas alleges that, four days before the auction, KKR formed the entity KRE "for the purpose of taking ownership of the Holding Company" and that KKR did this because it "knew that it would be the successful bidder at the Sale due to its conspiracy with Macquarie," which only further shows that defendants colluded.
Macquarie contends that the auction was commercially reasonable as a matter of law, and, therefore, the issue is susceptible to resolution at the motion to dismiss stage. Macquarie points to the fact that the auction was advertised for more than 10 days, that KKR and Sandalwood were able to comply with the bidding requirements, and that HUD approval was ultimately obtained within the 96 day period. However, Macquarie's argument ignores the standard we are to apply on a motion to dismiss, which requires this Court to afford the complaint the presumption of truth (Leon v Martinez, 84 NY2d 83, 87 [1994]). Moreover, Macquarie undermines its own argument by offering its version of the facts and its interpretation of what is commercially reasonable. Indeed, whether a term or requirement is commercially reasonable is generally an issue of fact that cannot be decided at this stage (Weinsten v Fleet Factors Corp., 210 AD2d 74 [1st Dept 1994]).
Nor do the cases relied upon by Macquarie warrant a different result. Those cases concerned issues of notice and were decided based on a review of the documentary evidence establishing that the secured party had indeed provided notice of the sale to the debtor (see e.g. Zwicker v Emigrant Mtge. Co., Inc., 91 AD3d 443 [1st Dept 2012]; Thornton v Citibank, 226 AD2d 162 [1st Dept 1996], lv denied 89 NY2d 805 [1996]). Here, the question of commercial reasonableness is not as clear cut as a question of the mailing procedures employed by the secured party.
Therefore, the motion court properly denied Macquarie's motion to dismiss the second cause of action because Atlas has adequately pleaded a claim for violation of UCC 9-610. [*10]However, and for reasons previously stated, that portion of the second cause of action seeking permanent injunctive relief setting aside the sale pursuant to UCC 9-625(a) must be dismissed as a matter of law. C. Atlas's Claim for a Return of the Surplus
UCC 9-615, Application of Proceeds of Disposition, provides that in the case of a surplus or deficiency of the cash proceeds of disposition, a secured party "after making the payments and applications required . . . shall account to and pay a debtor for any surplus" (UCC 9-615[d][1]). One such required payment application is for "reasonable attorney's fees and legal expenses incurred by the secured party" (UCC 9-615[a][1]). Here, there is no dispute that a surplus resulted from the payment of the winning bid of $76.75 million on the outstanding debt of $71 million (plus interest and fees).
The surplus is approximately $836,891.45, and Macquarie has not returned any of it to Atlas. Macquarie points to its $1.3 million in attorneys' fees as the reason for not returning any amount. However, there remains a question of reasonableness that cannot be answered at this pleading stage and, therefore, it would be premature to dismiss this claim.
D. Atlas's Remaining Claims Should Have Been Dismissed
Atlas asserted causes of action for breach of contract and breach of the duty of good faith and fair dealing, solely against Macquarie. Both claims are based on the allegation that Macquarie violated the Mezzanine Loan Agreement by conducting a commercially unreasonable sale. Atlas does not specify any provision of the agreement that allegedly was breached by Macquarie, nor does Atlas allege that it performed its obligations under the agreement. In fact, there is no dispute that Atlas defaulted on the loan and, therefore, did not perform its obligations under the agreement. Thus, the complaint fails to state of cause of action for breach of the loan agreement (see Chappo & Co., Inc. v Ion Geophysical Corp., 83 AD3d 499, 500 [1st Dept 2011]). Without a claim for breach of the loan agreement, the causes of action for tortious interference with the agreement and civil conspiracy as against KKR and KRE must also fail (see AREP Fifty-Seventh, LLC v PMGP Assoc., LP, 115 AD3d 402 [1st Dept 2014]; Riverbank Realty Co. v Koffman, 179 AD2d 542 [1st Dept 1992]).
Lastly, Atlas's demand for punitive damages must be stricken because the complaint fails to assert a tort claim against Macquarie or allege that Macquarie's conduct was aimed at the public (see Rocanova v Equitable Life Assur. Socy. of U.S., 83 NY2d 603, 613 [1994]).
Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered April 18, 2018, which denied defendants' motions to dismiss the complaint as against them, should be modified, on the law and the facts, to dismiss the first cause of action for a declaratory judgment in its entirety, to dismiss that portion of the second cause of action seeking to have the subject UCC sale declared void and invalid and set aside, to dismiss the causes of action for tortious interference with contract against defendant KKR (third cause of action), civil conspiracy against Macquarie and KKR (fourth cause of action), breach of contract and breach of the duty of good faith and fair dealing against Macquarie (fifth and sixth causes of action), and to strike the demand for punitive damages, and otherwise affirmed, without costs.
All concur.
Order, Supreme Court, New York County (Charles E. Ramos, J.), entered April 18, 2018, modified, on the law and the facts, to dismiss the first cause of action for a declaratory judgment in its entirety, to dismiss that portion of the second cause of action seeking to have the subject UCC sale declared void and invalid and set aside, to dismiss the causes of action for tortious interference with contract against defendant KKR (third cause of action), civil conspiracy against Macquarie and KKR (fourth cause of action), breach of contract and breach of the duty of good faith and fair dealing against Macquarie (fifth
and sixth causes of action), and to strike the demand for punitive damages, and otherwise [*11]affirmed, without costs.
Opinion by Kapnick, J. All concur.
Friedman, J.P., Gische, Kapnick, Kahn, Kern, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 6, 2019
CLERK



Footnotes

Footnote 1: Atlas contends that its interest in the properties is worth substantially more than $71 million, because the properties, net of debt from HUD, are worth at least $100 million. 

Footnote 2: Atlas does not pursue this line of argument in its brief. Rather, Macquarie's acceptance of KKR's lower bid is referenced in support of Atlas's claim for a violation of UCC 9-610, as further proof of the commercially unreasonable nature of the sale.

Footnote 3: The term "transferee" as opposed to "buyer" is used because "a person is a transferee' inasmuch as a buyer at a foreclosure sale does not meet the definition of purchaser' in Section 1-201 (the transfer is not, vis-a-vis the debtor, voluntary')" (Comment 2 to UCC 9-617[b].

Footnote 4: "Good Faith" is defined in the UCC as "honesty in fact in the transaction or conduct concerned" (UCC 1-201[20]).

Footnote 5: As noted by the Enron Court, article 9 was revised and became effective in New York on July 1, 2001 (see UCC 9-701). The former UCC 9-507(1) is the precursor to the current section UCC 9-625. The former UCC 9-507(1) provided, in relevant part, that "[i]f it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions." Comment 1 to former UCC 9-507(1) is instructive when analyzing the revised 9-625(a). It states, "[t]his remedy will be of particular importance when it is applied prospectively before the unreasonable disposition has been concluded. This section, therefore, provides that a secured party proposing to dispose of collateral in an unreasonable manner, may, by court order, be restrained from doing so . . . The Section further provides for damages where the unreasonable disposition has been concluded . . . " (Comment 1 to former UCC 9-507[1]).