**R. A. WEAVER AND ASSOCIATES, INC.**

v.

**ASPHALT CONSTRUCTION, INC., Appellant.**

No. 77–1820.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1978.

Decided Oct. 23, 1978.

As Amended Nov. 29, 1978.

Rehearing Denied Nov. 15, 1978.

Tarrant H. Lomax, Washington, D. C., for appellant. Paul M. Rhodes, Washington, D. C., was on the brief for appellant.

Harold F. Blasky, Washington, D. C., with whom Laurence Schor, Washington, D. C., was on the brief, for appellee.

Before WRIGHT, Chief Judge, and BAZELON and MacKINNON, Circuit Judges.

Opinion for the court filed by Chief Judge, J. SKELLY WRIGHT.

**J. SKELLY WRIGHT, Chief Judge:**

This appeal challenges a decision of the United States District Court for the District of Columbia holding that a contract for a fixed amount of limestone existed between R. A. Weaver & Associates, Inc. (appellee) and Asphalt Construction, Inc. (appellant) and that Asphalt Construction was in breach of that contract. We agree with the trial court that a contract existed between the parties, but we disagree as to the nature of the contract. In our view it was not, as the District Court held, a contract for a fixed amount of limestone, but rather one for that amount of limestone required by appellant to perform its subcontracting work on the Government's Constitution Gardens project. Since no limestone was required by appellant, the contract was not breached when appellant informed appellee that no limestone would be ordered. Accordingly, we conclude that the trial court committed reversible error in holding appellant in breach and that the trial court's findings as to liability and damages are, in consequence, rendered nugatory.

## I.  BACKGROUND

By agreement appellee R. A. Weaver & Associates, Inc. was to supply appellant Asphalt Construction, Inc., a subcontractor on the National Parks Service project at Constitution Gardens, with crushed limestone to be used on that project. The document that served as the basis of agreement between appellant and appellee was a two-page "Proposal and/or Contract" provided by appellee; it was sent by appellee to appellant on March 1, 1975. As will be further described below, this "Proposal and/or Contract" made reference to certain Government bid documents, portions of which the trial court found to be incorporated by the "Proposal and/or Contract" when it determined the amount of limestone involved in the transaction.

The genesis of the present dispute can be traced to April 24, 1975, when the National Park Service, pursuant to the "changes" and "termination" clauses [1] in its contract

---

1. The "changes" clause is the following provision found in the Government's standard form construction contract:

   3.  CHANGES

   (a) The Contracting Officer may, at any time, without notice to the sureties, by written order designated or indicated to be a change order, make any change in the work within the general scope of the contract, including but not limited to changes:

   (i) In the specifications (including drawings and designs);

   (ii) In the method or manner of performance of the work;

   (iii) In the Government-furnished facilities, equipment, materials, services, or site; or

   (iv) Directing acceleration in the performance of the work.

   (b) Any other written order or an oral order (which terms as used in this paragraph (b) shall include direction, instruction, interpretation, or determination) from the Contracting Officer, which causes any such change, shall be treated as a change order under this clause, provided that the Contractor gives the Contracting Officer written notice stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

   (c) Except as herein provided, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this

with appellant's prime contractor, decided to delete the provision for limestone. The prime contractor notified appellant of the Government's decision, and appellant, before any orders for limestone had been placed, in turn notified appellee that no limestone would be required. After unsuccessful attempts by the parties and the Government to arrive at an equitable solution,[2] appellee filed suit in the District Court, pursuant to that court's diversity jurisdiction, 28 U.S.C. § 1332 (1976),[3] alleging that appellant had breached its contract to purchase limestone from appellee.

The District Court found that an enforceable contract for a fixed amount of limestone existed between appellee and appellant and that appellant was indeed in breach.[4] The District Court went on to refer the case to a Special Master to make findings of fact and conclusions of law with respect to the issue of damages.[5] Subsequently, acting on those findings and conclusions, the court held appellant liable to appellee for damages amounting to $20,905.56 plus interest from June 30, 1976.[6] Appellant appeals from the District Court's judgments as to the existence of a contract, the nature of the contract found to be in existence, and the amount of liability.

## II. THE CONTRACT

The District Court found that an enforceable contract existed between the parties.

---

clause or entitle the Contractor to an equitable adjustment thereunder.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any order, an equitable adjustment shall be made and the contract modified in writing accordingly: *Provided, however,* That except for claims based on defective specifications, no claim for any change under (b) above shall be allowed for any costs incurred more than 20 days before the Contractor gives written notice as therein required: *And provided further,* That in the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with such defective specifications.

(e) If the Contractor intends to assert a claim for an equitable adjustment under this clause, he must, within 30 days after receipt of a written change order under (a) above or the furnishing of a written notice under (b) above, submit to the Contracting Officer a written statement setting forth the general nature and monetary extent of such claim, unless this period is extended by the Government. The statement of claim hereunder may be included in the notice under (b) above.

(f) No claim by the Contractor for an equitable adjustment hereunder shall be allowed if asserted after final payment under this contract.

Joint Appendix (JA) 16. Similarly, the "termination" clause is the following provision found in the Government's standard form construction contract:

31. TERMINATION FOR CONVENIENCE OF THE GOVERNMENT

(a) The Contracting Officer, by written notice, may terminate this Contract, in whole or in part, when it is in the interest of the Government. If this Contract is terminated, the Contractor shall be compensated in accordance with Part 1-8 of the Federal Procurement Regulations (41 CFR 1-8), in effect on this Contract's date.

(b) If this Contract exceeds $100,000, the clause in paragraph 1-8.703 of the Federal Procurement Regulations (41 CFR 1-8.703) in effect on the date of this Contract shall apply in lieu of the provisions set forth in (a) above, such clause being hereby incorporated by reference as fully as if set forth at length herein.

JA 17.

2. There is some dispute between the parties over whether any such attempts were properly undertaken. *Compare* appellee's brief at 5 *with* appellant's reply brief at 3-4 *and* Addendum to JA (found in appellant's reply brief after p. 20). The resolution of this controversy has no bearing on the outcome of this appeal.

3. Appellee R. A. Weaver & Associates, Inc. is a Maryland corporation, while appellant Asphalt Construction, Inc. is incorporated under the laws of the District of Columbia.

4. The District Court's Memorandum and Order is reproduced at JA 19-21.

5. The Special Master's Findings of Fact and Conclusions of Law are reproduced at JA 22-26.

6. The District Court's Memorandum Order adopting the Special Master's findings and conclusions is reproduced at JA 27-29.

It should be pointed out that the District Court did not find, and appellee does not allege, *see* Affidavit of R. A. Weaver, February 16, 1976, JA 18, that appellee suffered any out-of-pocket loss as a result of appellant's action. Liability was based only on a claim of lost profits.

On appeal appellant contests this holding by arguing that the agreement was not supported by consideration and that the agreement contained no quantity provision. If appellant is correct in either respect, there was indeed no contract. To determine the merits of appellant's claim, we must turn first to an examination of the agreement between the parties.

### A. The Nature of the Agreement

The agreement, as styled by appellee, was termed a "Proposal and/or Contract." It was submitted by appellee to appellant on February 12, 1975, and, as appellant concedes, appellant's brief at 5, and as the document plainly evinces, JA 4, it was "accepted" by appellant on March 1, 1975. This document provided, in part, that appellee would

> furnish our Genuine Select Buff Crushed Limestone coarse and fine aggregate of a Grade and Quality to conform to specified requirements as follows and to the Notes and Details listed.

*Id.* The "specified requirements as follows" was a reference to Government "Bid Item # 45 Crushed Limestone Aggregate." Inspection of Bid Item # 45, JA 8, reveals the following: "45/02655 Crushed stone paving . . . . . . . . 176,200 S.F. @ $ [Unit Price] = $ [Amount of Bid] ." The number "02655" is a reference to another Government bid document, JA 10, which also relates to crushed stone paving (hereinafter termed "section 02655").

▮▮▮▮ The District Court accepted without discussion that the agreement laid out above was supported by consideration. Presumably the court was guided by the belief that the agreement constituted a bilateral contract in which the parties' mutual

promises served as consideration. *See generally* 1 A. Corbin, Corbin on Contracts §§ 142–150, at 611–671 (1963). The respective promises supporting bilateral contracts must be scrutinized to determine whether the performance promised constitutes sufficient consideration. This is to say that the mere uttering of the promises, as opposed to their content, will not itself supply the consideration. *See* J. Calamari & J. Perillo, Contracts 156 (2d ed. 1977); 1 A. Corbin, *supra,* § 143, at 614 ("As a general rule * * a promise is a sufficient consideration for a return promise if the performance that is promised would be a sufficient consideration."). In the present case appellee promised to supply and appellant to buy limestone. Their agreement specified a unit price,[7] a method of delivery,[8] and a method of payment.[9] Reserving for a moment discussion of the quantity of limestone specified by their agreement, there is no doubt that the consideration, in the form of the substance of the parties' promises, necessary to elevate the agreement to the status of an enforceable contract was present. This conclusion comports with settled commercial practice. The use of proposals sent by suppliers to purchasers, such as the "Proposal and/or Contract" employed in this case, as the basis of a contract that arises upon acceptance of the proposal is certainly not a rare occurrence in the business world. *See, e. g., Romine, Inc. v. Savannah Steel Co.,* 117 Ga.App. 353, 160 S.E.2d 659, 661 (1968) (court looks to such a proposal in addition to subsequent communications for the basis of the contract).

### B. The Quantity Term

Appellant argues further that Section 2–201 of the Uniform Commercial Code (U.C.C.),[10] Article 2's version of the Statute of

---

7. *I.e.,* $25.00 per ton for both coarse and fine aggregate limestone. JA 4.

8. "Unit prices per ton are F.O.B. Hopper or Gondola Cars Potomac Yards Trussell consigned to Contractor or, at Contractors [*sic*] option, F.O.B. cars at D.C. Terminal yards adjacent to A.C.I. property." *Id.*

9. "All Crushed Limestone consigned to Contractor F.O.B. cars and properly Invoiced by

Weaver to Contractor on or by the 25th day of the Month shall be payable Net on or by *the last day* of the *Month following such deliveries." Id.* (emphasis in original).

10. The U.C.C. has been codified in Title 28 of the District of Columbia Code. All citations in this opinion will be to the U.C.C. itself, whose sections correspond without variance to those codified in Title 28.

Frauds, requires a quantity term in order for an agreement to be an enforceable contract and that the present agreement does not contain such a term. To determine whether this requirement has been met, inquiry must focus initially on the part of the agreement that, according to the District Court, incorporated the terms of the Government bid documents, in which any quantity term is to be found. That portion of the agreement obligated appellee to supply limestone "of a Grade and Quality to conform to specified requirements"—that is, to conform to Bid Item # 45 and its supporting document, section 02655. This Government bid documentation, in turn, states that crushed limestone of a specified depth would be required to cover an area comprising 176,200 square feet and that certain qualitative standards should be met in the limestone supplied. JA 8–14. Thus, although the incorporating language of the "Proposal and/or Contract" talks of "Grade" and "Quality," the bid documentation talks also of quantity. Appellant argues that this disparity in language means that the quantity provision as derived from Bid Item # 45 and section 02655 was not incorporated into the agreement.

We disagree. Although the agreement's incorporation language is markedly imprecise, the thrust of the language, and of the surrounding transaction, is to incorporate the terms and conditions of Bid Item # 45 and section 02655, including the quantity term. Hence the agreement survives scrutiny under U.C.C. § 2–201. But, as the next section of this opinion concludes, the effect of incorporating all the terms and conditions of Bid Item # 45 and section 02655, as contrasted with the selective incorporation practiced by the District Court, is to supply the contract not with a specific quantity term, as held by the District Court, but with one based on the requirements of the appellant in doing its subcontracting work for the Government.

## C. Requirements Contract

■ Normally a requirements contract is based on a seller's obligation to supply the designated commodity to the buyer to the extent of the latter's needs during a specified period of time. *See, e.g.,* 1 Williston on Contracts § 104A, at 402 (W. Jaeger ed.) (3d ed. 1957); *Shader Contractors, Inc. v. United States,* 276 F.2d 1, 4, 149 Ct.Cl. 535 (1960). Thus a court in fixing the remedy for breach of such a contract looks generally to the parties' ongoing relationship to see what usually is "required" under the contract to determine the damages for which the party in breach is liable. *See generally* J. White & R. Summers, Uniform Commercial Code 103–109 (1972). But this is not the only type of requirements contract. "Contractors often enter into contracts for the purchase of commodities in such quantities as will be required for particular construction jobs." 1 R. Anderson, Uniform Commercial Code 431 (2d ed. 1970); *see, e. g., Romine, Inc. v. Savannah Steel Co., supra.* Hence, that the quantities involved here were confined to one transaction and were, as a consequence, susceptible under the District Court's analysis to fairly precise, *a priori* determination does not disqualify the contract at issue from classification as a requirements contract.

■ Establishing that the contract is not barred from classification as a requirements contract is not, of course, tantamount to concluding that it indeed is such a contract. Something more is needed. What casts the agreement at issue here as a requirements contract is the following language, which is conspicuously located in the same Government bid document that contains the incorporated Bid Item # 45:

> Above quantities [including that stated in Bid Item # 45] *are estimated and will be used to canvass bids but payment will be made only for actual quantities of work completed.*

JA 9 (emphasis added). Of equal force and significance is language in section 02655 of the incorporated bid documents, a section to which Bid Item # 45 refers and on which the District Court in part based its calculations of the quantity of limestone involved in the transaction:

The amount to be paid for will be the actual number of square feet of crushed stone paving *installed, measured in place, and accepted.* \* \* \*

JA 15 (emphasis added). In our view, this language, under the Supreme Court's analysis in *Brawley v. United States,* 96 U.S. (6 Otto) 168, 24 L.Ed. 622 (1877); *accord, Shader Contractors, Inc. v. United States, supra,* transforms the contract from one containing a specified quantity term, as held by the District Court, to one dependent upon appellant's needs in performing its subcontracting work for the Government.

*Brawley* held that qualifying words in a contract such as "more or less," "about," and "words of like import" (presumably including the "estimated" used in the present contract) serve only "for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight." 96 U.S. (6 Otto) at 171–172. On their own, in other words, these terms do not make garden-variety bilateral contracts into requirements contracts. But where "the qualifying words are supplemented by other stipulations or conditions which give them a broader scope or a more extensive significance, then the contract is to be governed by such added stipulations or conditions." *Id.* at 172. In *Brawley* the language "as shall be determined to be necessary by the post-commander," *id.* at 173, was held in conjunction with "more or less" to turn the contract in question into a requirements contract, based upon needs as determined by the post-commander. In the present case, not only did the language of the bid document label the quantity term as an estimate—roughly analogous to "more or less"—but it stated specifically that the quantities listed in the bid documents were (1) used to canvass bids, and (2) not to be the basis of any payment by the ultimate consumer of the products, the Government, since "payment will be made only for actual quantities of work completed." JA 9. No work using limestone was completed, hence no payment was made. This result, given the specificity of the quoted language, should have been readily foreseeable to ap-

pellee at the time it made reference to Bid Item # 45 in the "Proposal and/or Contract," which it in fact drafted. Commercial common sense would certainly not have yielded the conclusion that the quoted language is without meaning to a party contracting to supply limestone to a Government subcontractor, whose need for the limestone was wholly derivative from the Government's need and entirely subject to the quoted contractual language. Moreover, a result that rendered the quoted language meaningless would leave unanswered the question of how the District Court could consistently incorporate parts of the bid documents in computing quantity while refusing to incorporate other, equally relevant parts that cast quantity in terms of requirements.

The conclusion that the incorporated bid documents as a whole transform the agreement into a requirements contract is buttressed by the general knowledge of dealing with the Government that, it can be assumed, appellee possessed. Appellee had in fact been party to a contract to supply limestone under similar conditions for another National Parks Service project prior to entering the present agreement with appellant. *See* Affidavit of R. A. Weaver, February 16, 1976, JA 18. It thus had ample opportunity to gain exposure to the Government's standard "changes" and "termination" provisions at least once prior to the present transaction. Appellee believes it should not be charged with this knowledge. On the contrary, we believe it should. Throughout the U.C.C. the distinction is made between "merchants" and ordinary buyers and sellers. The former, defined at U.C.C. § 2–104(1), are charged as having "knowledge or skill peculiar to the practices or goods involved in the transaction," *id.,* and a transaction "between merchants" means "any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants." U.C.C. § 2–104(3). This analytical distinction in the U.C.C. between merchants and ordinary buyers and sellers, though not dictating a specific conclusion to the dispute at

issue here as it would, for example, in some cases involving implied warranties of merchantability, *see* U.C.C. § 2–314(1), nevertheless legitimates inquiry into the parties' level of knowledge of the particular business environment, and further legitimates the conclusion that appellee, as a merchant in the sale of limestone used on Government projects, was cognizant of the business environment in which it operated. This conclusion receives additional support from the Code, which also states that "any usage of trade in the vocation or trade in which [the parties] are engaged or of which they are or should be aware give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement." U.C.C. § 1–205(3). The U.C.C. defines a "usage of trade" as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." U.C.C. § 1–205(2). The existence and potential invocation of the Government's standard "changes" clause would seem to qualify as such a usage of trade.

Thus the language from the bid documents quoted earlier, *see* 190 U.S.App. D.C. at ——, 587 F.2d at 1319, *supra*, especially in light of the knowledge of the particular business environment possessed by appellee, leads this court to conclude that the contract, viewed as a whole, was not for a specific quantity of limestone, but for the amount of limestone required by appellant in doing its work on the National Park Service project at Constitution Gardens.

The District Court thus erred in holding that the agreement was not a requirements contract.[11]

█ It remains only to add that appellant did not breach the requirements contract by directing appellee not to send it any limestone. As Professors White and Summers have written, "[I]t is not true that buyers may never decrease or cease their requirements. Both pre-Code cases and 2–306(1) allow 'good faith' reductions and even abandonment." J. White & R. Summers, *supra,* at 108; *see, e. g., HML Corp. v. General Foods Corp.,* 365 F.2d 77, 81 (3d Cir. 1966) (applying New York law) ("The better view * * * is that generally the buyer in a requirements contract is required merely to exercise good faith in determining his requirements and the seller assumes the risk of all good faith variations in the buyer's requirements * * *."); *id.* at 81 n.5 (dictum) (U.C.C. § 2–306(1) does not alter the established good faith criterion); *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.,* 130 F.2d 471, 473 (3d Cir. 1942) (under pre-Code Pennsylvania law, "the buyer in a requirements contract has no duty to have any requirements * *. * * * [G]ood faith is required * *."); *Feld v. Henry S. Levy & Sons, Inc.,* 37 N.Y.2d 466, 373 N.Y.S.2d 102, 105, 335 N.E.2d 320, 322 (1975) (under U.C.C. § 2–306(1) "good faith cessation of production terminates any further obligations" under output contract).

U.C.C. § 2–306(1), to be sure, limits parties to output or requirements contracts by

---

11. It may be thought that the Government's not abiding by its original construction decision to use limestone was merely a failure to supply the condition precedent that, once supplied, would trigger appellant's obligation of full performance under the contract. Since the condition precedent was not supplied by the Government in this case, appellant had no duty to perform. The problem with this line of thought is that, while it leads to the same result in the present case as the analysis employed in text, it cannot accommodate a situation in which the Government decides, as it well could under its "changes" clause, to reduce substantially its consumption of a commodity without deleting the commodity entirely from the transaction, as it did in the present case. Would a downward shift of, say, 50% in the Government's consumption of the commodity compared to that amount stated in the original contract mean that the condition precedent was supplied? An analysis based on requirements, unlike a simple condition precedent analysis, can take such a situation into account. And more to the point, a requirements analysis places the emphasis in the present case where it belongs—on the language in the incorporated bid documents that casts the stated quantities in terms of requirements, not on the Government's standard "changes" and "termination" clauses. Appellee's knowledge of the latter merely makes more clear the requirements nature of the incorporated language.

stating "that no quantity unreasonably disproportionate to any stated estimate or * * * to any normal or otherwise comparable prior output or requirements may be tendered or demanded." Under our analysis the language of the Government bid documents that labels the stated quantities as estimates is crucial. The limiting language of Section 2–306(1) accordingly would seem to preclude appellant's reducing its requirements to zero, for zero would appear the quintessential "disproportionate amount." Professors White and Summers conclude, however, and we agree, that the limiting language of Section 2–306(1) does not preclude *good faith reductions* that are highly disproportionate to normal prior requirements or stated estimates. "Even drastic good faith reductions are not unreasonably disproportionate." J. White & R. Summers, *supra*, at 109. Their emphasis on good faith is appropriate because U.C.C. § 2–306(1) defines "requirements" in terms of good faith,[12] and because a good faith criterion prevents parties from unreasonably taking advantage of market fluctuations by escaping their contractual obligations.[13]

## III.  CONCLUSION

For the reasons stated in this opinion, we hold that the District Court erred by not regarding the agreement at issue as a requirements contract. Accordingly, we reverse that court's judgment both as to the

nature of the contract and as to appellant's liability to appellee.

*Reversed.*

---

12.  U.C.C. § 2–306(1) reads in full:

A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

See U.C.C. § 2–306, Official Comment 2 ("a contract for output or requirements * * * is held to mean the actual good faith output or requirements"); U.C.C. § 1–203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement.").

13.  Other commentators have also concluded that U.C.C. § 2–306(1) does not preclude drastic good faith reductions in requirements. *See* Note, *Requirements Contracts: Problems of Drafting and Construction,* 78 Harv.L.Rev. 1212, 1220 (1965) ("While * * * UCC [§ 2–306(1)] undoubtedly limits the amount by which a buyer may increase his orders, it is doubtful that it was intended to limit decreases in the same fashion."); Note, *Requirements Contracts Under the Uniform Commercial Code,* 102 U.Pa.L.Rev. 654, 664–666 (1954) (arguing that the most plausible construction is that "the exception protects the seller only from demands unreasonably in excess of the stated estimate of prior requirements but does not guarantee to the seller orders of at least a reasonably proportionate minimum").