**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 19, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

DAVIDSON OIL COMPANY,

    Plaintiff - Appellee.

v.

No. 23-2116

CITY OF ALBUQUERQUE,

    Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:20-CV-00838-RB-JMR)**

_____

Robert J. Desiderio, Sanchez, Mowrer & Desiderio, P.C., Albuquerque, New Mexico (Janette Angelica Duran, Sanchez, Mowrer & Desiderio, P.C., Albuquerque, New Mexico; Lauren Keefe and Devon King, Office of the City Attorney, Albuquerque, New Mexico, with him on the brief), for Defendant-Appellant.

Ross L. Crown, Lewis Roca Rothgerber Christie LLP, Albuquerque, New Mexico, for Plaintiff-Appellee.

_____

Before **McHUGH**, **MURPHY**, and **CARSON**, Circuit Judges.

_____

**CARSON**, Circuit Judge.

_____

A buyer who signs a fixed-price requirements contract knows the market price for the commodity will fluctuate but the buyer's obligation will remain the same. If the market price rises, the fixed price will insulate the buyer from the market

fluctuation.  But if the commodity's market price falls, the buyer must honor its contract—even though the buyer could attain a better bargain elsewhere.

Defendant City of Albuquerque contracted Plaintiff Davidson Oil Company to fulfill all of Defendant's fuel needs at a fixed price.  Fuel market prices dipped, and Defendant terminated its contract with Plaintiff by invoking its termination for convenience clause.  But before Defendant terminated the contract, Plaintiff protected itself against market fluctuation by signing hedge contracts with a third party—contracts Defendant knew Plaintiff had signed.  Plaintiff sued Defendant for breach of contract, and both parties moved for summary judgment.  The district court granted Plaintiff summary judgment, awarding Plaintiff the value of its hedge contracts as damages.  We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I.

Defendant City of Albuquerque solicited bids from fuel distributors to supply its fleet with diesel and gasoline.  Plaintiff Davidson Oil Company submitted the winning bid, and the parties signed a requirements contract ("Supply Contract").[1]  Rather than contracting for a set amount of fuel, Defendant agreed to pay a fixed price for each gallon of diesel and gasoline Defendant ordered from Plaintiff for a

---

[1] A requirements contract is one "in which the purchaser agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract."  Mason v. United States, 615 F.2d 1343, 1346 (Ct. Cl. 1980) (quoting Media Press, Inc. v. United States, 566 F.2d 1192 at *1 (Ct. Cl. 1977)).

2

calendar year.[2]  But the Supply Contract also included a Termination for Convenience ("TFC") clause, providing that Defendant could "terminate the contract at any time by giving at least [sixty] days' written notice to [Plaintiff]."

Just days after Plaintiff signed the Supply Contract, Defendant asked Plaintiff to "consider a reduction of pricing" under the Supply Contract because Defendant believed market fuel prices had declined by 7.5% to 12.2% since the parties signed the Supply Contract.  Plaintiff declined: a "reduction in the fixed prices called for by the [Supply Contract] below the hedge prices would cause [Plaintiff] to lose money." So on March 19, 2020, Defendant gave sixty days' notice of its intent to exercise the TFC clause, terminating the Supply Contract on May 19, 2020.

Plaintiff sued Defendant for breach of contract.  Both parties moved for summary judgment on liability, and Plaintiff moved for summary judgment on damages.  The district court granted Plaintiff's motion for summary judgment, finding that, although Defendant had not breached the terms of the Supply Contract, Defendant had violated an implied covenant.  Defendant appeals the district court's grant of summary judgment and award of damages.

II.

We review de novo cross-motions for summary judgment, viewing the evidence in the light most favorable to the non-prevailing party.  See Allen v. Sybase,

---

[2] The parties agreed that Defendant would pay $1.7732 per gallon of gasoline and $1.9798 per gallon of diesel.  Because Defendant could adjust the quantity of fuel it bought from Plaintiff, Defendant's profit was variable.  But by the hedge contract, Plaintiff ensured its profit *margin* would remain constant.

Inc., 468 F.3d 642, 649 (10th Cir. 2006) (quoting Jacklovich v. Simmons, 392 F.3d 420, 425 (10th Cir. 2004)).  A court should grant summary judgment if it determines no genuine dispute exists about any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018) (citing McCoy v. Meyers, 887 F.3d 1034, 1044 (10th Cir. 2018)).

We will affirm a district court's grant of summary judgment "if any proper ground exists to support the district court's ruling."  McKibben v. Chubb, 840 F.2d 1525, 1528 (10th Cir. 1988) (citing Lindsey v. Dayton-Hudson Corp., 592 F.2d 1118, 1124 (10th Cir. 1979)).  Accordingly, we can affirm a judgment on a different basis than the basis on which the district court relied, provided the appellant had a fair chance to respond.  Alpine Bank v. Hubbell, 555 F.3d 1097, 1108 (10th Cir. 2009) (quoting Maldonado v. City of Altus, 433 F.3d 1294, 1302–03 (10th Cir. 2006)).

Because the parties agree no dispute of material facts exists, this case turns on whether Plaintiff is entitled to judgment as a matter of law.[3]  Fed. R. Civ. P. 56(a).  Plaintiff is entitled to judgment as a matter of law if Defendant breached the Supply Contract—either by breaching the terms of the contract or by violating an implied covenant.

---

[3] Sitting in diversity under 28 U.S.C. § 1332(a)(1), we apply New Mexico law in interpreting the contract; the supply contract specified that it was governed by New Mexico law, and the parties agree to the same on appeal.

4

A.

First, we ask whether Defendant breached the Supply Contract.[4]  New Mexico

law has embraced the well-settled principle that an illusory contract is

unenforceable.[5]  Salazar v. Citadel Commc'ns Corp., 90 P.3d 466, 469 (N.M. 2004)

(citing Bd. of Educ. v. James Hamilton Constr. Co., 891 P.2d 556, 561 (N.M. Ct.

App. 1994)).  Although a TFC clause generally empowers a party to terminate a

contract without cause, New Mexico law recognizes that TFC clauses render the host

contract illusory if read literally.  Mb Oil Ltd., Co. v. City of Albuquerque, 382 P.3d

975, 979 (N.M. Ct. App. 2016) (citing Torncello v. United States, 681 F.2d 756, 769

---

[4] Defendant argues that we cannot consider whether Defendant breached the terms of the supply contract because Plaintiff did not file a cross-appeal.  We disagree.  A cross-appeal is appropriate if an appellee seeks relief from an unsatisfactory judgment.  E.g., Scott v. City of New York, 626 F.3d 130, 132 (2d Cir. 2010) (analyzing a cross-appeal where the appellee sought to increase his damages).  But a cross-appeal is not necessary if an appellee asks us to affirm a district court's judgment, even if on an alternative basis.  See United Fire & Cas. Co. v. Boulder Plaza Residential, LLC, 633 F.3d 951, 958 (10th Cir. 2011) (quoting Ute Distrib. Corp. v. Sec'y of Interior, 584 F.3d 1275, 1282 (10th Cir. 2009)).  Even where an appellee attacks the reasoning of the lower court, a cross-appeal is unnecessary—so long as the appellee urges affirmance on the basis of a "matter appearing in the record."  Id.  Plaintiff seeks neither relief from, nor alteration of, the district court's judgment.  Instead, Plaintiff argues that we should affirm the district court on alternative grounds.  And because the district court considered Plaintiff's claim about the terms of the supply contract, the issue appears in the record.  Therefore, we consider whether Defendant breached the terms of the supply contract without a cross-appeal.

[5] "A valid contract must possess mutuality of obligation"—that is to say, "consideration."  Sisneros v. Citadel Broad. Co., 142 P.3d 34, 42 (N.M. Ct. App. 2006) (quoting Talbott v. Roswell Hosp. Corp., 118 P.3d 194, 198 (N.M. Ct. App. 2005)).  But a party who provides an illusory promise does not obligate itself or provide consideration because, despite appearances, that party has not actually promised anything.  Id.

(Ct. Cl. 1982)).  To prevent illusory government contracts, New Mexico courts apply the approach of the Federal Circuit: if a government party exercises a TFC clause as an abuse of discretion or in bad faith, it breaches the government contract.[6]  Id. (citing Krygoski Constr. Co. v. United States, 94 F.3d 1537, 1543 (Fed. Cir. 1996)).

To establish that Defendant exercised the TFC clause as an abuse of discretion or in bad faith, Plaintiff must provide near-indisputable proof that Defendant did not terminate the Supply Contract in good faith.  Id. (citing Kalvar Corp. v. United States, 543 F.2d 1298, 1301–02 (Ct. Cl. 1976)).  Plaintiff will meet this burden if it demonstrates Defendant:

> (1) [was] motivated by malice, Gadsden v. United States, 78 F. Supp. 126, 128 (Ct. Cl. 1948); (2) [was] involved in a conspiracy to get rid of [Plaintiff], Knotts v. United States, 121 F. Supp. 630, 636 (Ct. Cl. 1954); (3) *sought only to secure a better bargain from a competing supplier in a requirements contract*, Torncello, 681 F.2d at 772; or (4) never intended to keep its promise when the promise was made, Krygoski Constr. Co., 94 F.3d at 1545.

Mb Oil Ltd, 382 P.3d at 979–80 (emphasis added).

Plaintiff argues Defendant exercised the TFC clause in bad faith because Defendant sought only to secure a better bargain.[7]  We agree.  Three considerations

---

[6] At least one New Mexico court has alluded to the "changed circumstances" standard from Torncello, 681 F.2d at 771.  See Mb Oil Ltd, 382 P.3d at 980.  But we need not decide whether Defendant violated the changed circumstances standard, nor whether the standard remains good law, because we hold that Defendant exercised the TFC clause impermissibly.

[7] Plaintiff also argues that Defendant never intended to be bound by the supply contract.  But because Plaintiff has shown that Defendant sought only to secure a better bargain by exercising the TFC clause, we need not answer whether Defendant intended to be bound by the supply contract.

inform our decision.  First, Defendant's statements demonstrate that Defendant sought only to secure a better bargain.  Prior to terminating the contract, Defendant informed Plaintiff of its belief that the market price for fuel had declined by 7.5% to 12.2%, demonstrating that Defendant "knew of the better price it later terminated the contract to obtain" at the time of cancellation.  Krygoski, 94 F.3d at 1541.  And after cancelling the Supply Contract, Defendant explained that its decision was financially motivated—demanded by "the drop in revenue" and "the massive change in the oil market."  During discovery, Defendant explained it exercised the TFC clause because of "[t]he pandemic in combination with the catastrophic decline in oil prices."  By these statements, Plaintiff has shown that the Supply Contract was not itself causing Defendant's inconvenience; instead, the better bargains offered on the open market provoked Defendant's termination.

Second, Defendant's actions demonstrate that Defendant sought only to secure a better bargain.  Before terminating the contract, Defendant requested that Plaintiff alter their agreement to give Defendant "a reduction of pricing."  Only when Plaintiff declined did Defendant terminate the Supply Contract.  Soon after, Defendant signed another fuel supply contract with a different provider—Truman Arnold Companies.  While the Supply Contract had obligated Defendant to pay Plaintiff $1.7732 per gallon of gasoline and $1.9798 per gallon of diesel, Defendant's new contract permitted it to pay, on average, $1.44 per gallon of gasoline and $1.45 per gallon of

diesel.[8]  In other words, shortly after seeking a price reduction from Plaintiff,

Defendant sought—and acquired—a better bargain from another supplier.

Finally, when combined with the other evidence, the nature of the Supply

Contract demonstrates that Defendant sought only to secure a better bargain.  As a

requirements contract, the Supply Contract was extremely flexible, adapting to

changes in Defendant's fuel needs.  Because the Supply Contract did not mandate a

minimum purchase, if Defendant decreased its fuel usage, the Supply Contract

ensured Defendant's financial obligation would decrease proportionally.  And

because the Supply Contract required Plaintiff to fulfill Defendant's orders within

twenty-four hours, the Supply Contract ensured Defendant would have sufficient

fuel, even if Defendant's needs changed quickly or unforeseeably—or even

dissipated entirely.[9]  Similarly, the Supply Contract enabled Defendant to relieve any

---

[8] Defendant points out that its new fuel contract was not a fixed-price requirements contract.  Though true, this fact does not change our conclusion for two reasons.  First, the contractual form of Defendant's after-the-fact bargain has little bearing on Defendant's motivation in exercising the supply contract's TFC clause.  Second, given the unusually low market price for fuel at Defendant's breach, we would not have expected Defendant to sign a fixed-price contract: a reasonable supplier would not offer Defendant a fixed-price contract at market value, predicting a market increase.

[9] This is not to say that the Uniform Commercial Code provided Defendant unlimited autonomy to decrease its purchases under the supply contract.  Cf. Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., 130 F.2d 471, 473 (3d Cir. 1942) ("It may be assumed that good faith is required and that a party under contract cannot pretend not to have a requirement to avoid his obligations under the contract."); Dienes Corp. v. Long Island R.R. Co., 47 UCC Rep. Serv. 2d (West) 941 (E.D.N.Y. 2002) (holding that a buyer did not breach a requirements contract where he decreased his purchases in good faith).

budgetary pressure by purchasing only what fuel it needed or could afford. If Defendant felt it necessary to spend less money on fuel, or felt it needed less fuel than it originally anticipated, Defendant could order less fuel under the terms of the Supply Contract.[10]

Our reasoning is consistent with established D.C. Circuit precedent. See R.A. Weaver & Assocs., Inc. v. Asphalt Const., Inc., 587 F.2d 1315, 1320 (D.C. Cir. 1978). In Weaver, the D.C. Circuit reviewed a requirements contract between a subcontractor and a prime contractor. Id. at 1316. In the requirements contract, the subcontractor agreed to sell limestone to the prime contractor according to the prime contractor's needs. Id. at 1319. But the prime contractor's needs changed, and it no longer needed any limestone. Id. at 1317. So the prime contractor did not order any limestone from the subcontractor, and the subcontractor sued the prime contractor for breach of the requirements contract. Id. The D.C. Circuit held that the prime contractor had not breached the requirements contract because the contract did not require the prime contractor to make any purchases. Id. at 1320. Therefore, the requirements contract permitted the prime contractor to decrease—or even cease— ordering limestone from the subcontractor. Id.

---

[10] Some courts have held under the Uniform Commercial Code that the buyer under a requirements contract cannot demand disproportionately *more* than its estimation. E.g., Empire Gas Corp. v. Am. Bakeries Co., 840 F.2d 1333, 1337 (7th Cir. 1988) ("This limitation is fairly easy to understand when the disproportion takes the form of the buyer's demanding more than the amount estimated. If there were no ceiling, and if the price happened to be advantageous to the buyer, he might increase his 'requirements' so that he could resell the good at a profit.").

9

Our case is comparable. The Supply Contract did not require Defendant to purchase any fuel from Plaintiff. Accordingly, Defendant could spend less on fuel without breaching the Supply Contract by decreasing—or even ceasing—ordering fuel. Yet Defendant exercised the TFC clause anyway, demonstrating that Defendant terminated the Supply Contract to seek a better bargain: unlike a better bargain from a competing supplier, the Supply Contract did not allow Defendant to receive more fuel for less money.

In sum, Plaintiff has shown that Defendant exercised the TFC clause solely to secure a better bargain—a breach of the contract. See Mb Oil Ltd., 382 P.3d at 980 (quoting Torncello, 681 F.2d at 772).

## B.

Defendant presents two other arguments for why its exercise of the TFC clause was not a breach of the Supply Contract. Neither persuades us.

## 1.

Defendant argues that it did not breach the supply contract because it exercised the TFC clause because of the "unprecedented decline in oil prices" caused by the COVID-19 pandemic. We are not persuaded by Defendant's argument for a few reasons. First, Defendant undermined the factual predicate for its argument by acknowledging that the market price of fuel would vary. In soliciting bids, Defendant specified that it would only consider bids with "a firm fixed price," would not consider bids that allowed for adjustments to fuel price for "market fluctuation," and would "not take into consideration [fuel] pricing that *will fluctuate daily*."

10

(Emphasis added.)  Furthermore, part of the very purpose of setting a fixed price in a requirements contract is to insulate the parties from market price fluctuation.  Cf. Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 678 (3d Cir. 1991) (explaining that purchasing parties enter requirements contracts "to have assurances of supply and fixed price").  Certainly, Defendant could not predict how much the fuel market price would vary, nor why it would vary—but *that* the price would vary was a fundamental principle of the Supply Contract Defendant recognized both explicitly and implicitly.  Yet when the fuel market price varied, Defendant exercised the TFC clause to seek a better bargain—a breach of the Supply Contract.

Second, Defendant's argument presumes that Defendant's exercise of the TFC clause could not be both (1) provoked by the pandemic, *and* (2) exercised solely "to secure a better bargain from a competing supplier."  See Mb Oil Ltd, 382 P.3d at 980 (citing Torncello, 681 F.2d at 772).  This dichotomy is false: even if an unpredictable event created the conditions in which competing suppliers would give Defendant a better bargain, Defendant would still breach the Supply Contract if Defendant exercised the TFC clause "to secure a better bargain."  Id. (citing Torncello, 681 F.2d at 772).

Finally, Defendant's argument bypasses the pertinent inquiry.  Neither the rarity of the cause (a pandemic) nor the size of the effect (a sizable decline in oil prices) bear on whether Defendant exercised the TFC clause "to secure a better bargain."  Id. (citing Torncello, 681 F.2d at 772).  Certainly, the pandemic influenced how *much* better the competing bargains were.  But whether the competing bargains

11

were slightly or significantly better is irrelevant to whether Defendant could exercise the TFC clause to secure a better bargain. See id. Defendant could not but did so anyway—a breach of the contract. Id.

2.

Defendant also argues that its exercise of the TFC clause "rested on more than market fluctuations" because the pandemic curbed purchases of goods and services on which Defendant levied taxes, causing uncertainty in Defendant's revenue. We are unpersuaded by this argument under our previous analysis: the Supply Contract permitted Defendant's costs to decrease proportional to fuel usage. If Defendant shrank its budget, it could also shrink its fuel expenditures without breaching the Supply Contract. But under New Mexico law, the Supply Contract prohibited Defendant from exercising the TFC clause to find a better bargain from another supplier. See id.

C.

The district court relied heavily on Northrop Grumman Corp. v. United States, 46 Fed. Cl. 622 (Fed. Cl. 2000), in determining that Plaintiff failed to demonstrate Defendant exercised the TFC clause in bad faith. Davidson Oil Co. v. City of Albuquerque, 624 F. Supp. 3d 1240, 1253–54 (D.N.M. 2023). But because we disagree with the district court's interpretation of Northrop Grumman, we depart from the district court's conclusion.

In Northrop Grumman, the National Aeronautics and Space Administration ("NASA") engaged four contractors to jointly construct the Space Station. 46 Fed.

Cl. at 623.  But because NASA did not designate a prime contractor to lead, the program operated so inefficiently that NASA began to lose political support for the project.  Id. at 627, 627 n.7.  To ensure that the Space Station would be built, NASA designated one prime contractor, exercising the TFC clause in Northrop Grumman's contract.  Id. at 624, 626.  Northrop Grumman sued, arguing that NASA had breached the contract by exercising the TFC clause to seek a better bargain.  Id. at 626–27.  The Court of Federal Claims found otherwise, determining that NASA had not exercised the TFC clause "to acquire a better bargain from another source, even if that may have been the result."  Id. at 627.  The court based this determination on NASA's "motive and intent," concluding that NASA did not exercise the TFC clause to acquire a better bargain but "to save the Space Station" from inefficient leadership.  Id. at 624, 627.  Relying on Northrop Grumman, the district court found that Defendant did not exercise the Supply Contract's TFC clause acquire a better bargain, but to "revamp[] its budget" in light of the pandemic.  Davidson Oil Co., 624 F. Supp. 3d at 1254.

Our decision reflects a proper reading of Northrop Grumman for three reasons.  First, in Northrop Grumman, any bargain NASA received was only an incidental effect of rectifying the inefficient accountability structure that was impairing the space station's construction.  But here Defendant sought a better bargain as the

central means for revamping its budget.[11]  This distinction is significant: had NASA cancelled its contract with Northrup Grumman and not received a better bargain, it would still have affected its goal of "sav[ing] the Space Station," decreasing the "managerial mess," and increasing the contractors' "overall responsibility for the project."  Id. at 624, 627, 627 n.7.  But here, had Defendant cancelled the Supply Contract and not received a better fuel price, it would have failed to affect its goal of budgetary change.  We disagree with the district court's application of Northrop Grumman because acquiring a better bargain was the central motivation in Defendant's exercise of the TFC clause.

Second, we see no meaningful difference between Defendant wanting to spend less money on fuel in general and wanting to spend less money on fuel to allow for other expenditures.  Yet under the district court's application of Northrop Grumman, only one of these explanations would give rise to a breach.  Assigning dollars to another budgetary use requires that those dollars are not spent on the original use.  But if the reallocation depends on receiving a better bargain, the buyer breaches the contract.  Mb Oil Ltd, 382 P.3d at 980 (quoting Torncello, 681 F.2d at 772).

---

[11] When Defendant first contacted Plaintiff about a price reduction, Defendant made no mention of COVID-19 or Defendant's budget.  Instead, Defendant explained it was seeking a price reduction because of the "recent decrease in oil pricing."  Therefore, although we assume for the sake of this holding that Defendant was motivated to exercise the TFC clause by a desire to revamp its budget in light of the pandemic, we note that this explanation is inconsistent with the record.

Finally, the district court's application of <u>Northrop Grumman</u> would swallow the rule prohibiting exercising a TFC clause to secure a better bargain. By swapping one financial explanation—the availability of a better bargain—for another equivalent financial explanation—the quality of a budget—any party could exercise any TFC clause so long as the party says the word "budget," not "bargain." And because any budget will operate more effectively if the budgeter acquires a better bargain, any TFC clause could be exercised in bad faith.

Because we hold that Defendant breached the terms of the Supply Contract by exercising the TFC clause to secure a better bargain, we affirm the district court's judgment on an alternative ground without deciding whether Defendant violated an implied covenant.

## III.

We turn to damages. We review the amount of a damage award for clear error and review the district court's methodology de novo, including "the proper elements of the award" or the scope of recovery. <u>Niemi v. Lasshofer</u>, 770 F.3d 1331, 1354 (10th Cir. 2014) (quoting <u>Sw. Stainless, LP v. Sappington</u>, 582 F.3d 1176, 1183 (10th Cir. 2009)).

## A.

After signing the Supply Contract, Plaintiff purchased twelve, one-month hedge contracts, covering the calendar year of the Supply Contract. In essence, Plaintiff paid a third party to swap financial positions with it: Plaintiff received fixed fuel prices, and the third party received the floating market prices. If market prices

15

rose above the fixed prices of the hedge contracts, the third party would pay Plaintiff the difference between the hedge and market prices. On the other hand, if market prices fell below the fixed prices of the hedge contracts, Plaintiff would pay the third party the difference between the hedge and market prices. But if market prices fell, because Plaintiff had a right to sell fuel to the city at a fixed price under the Supply Contract, Plaintiff intended to cover any monthly losses on the hedge contracts with its Supply Contract revenue.[12]

Although Defendant breached the Supply Contract, Plaintiff's hedge obligations remained. In maintaining these obligations, Plaintiff paid to its hedge partner a net total of $601,858.99.[13] Davidson Oil Co. v. City of Albuquerque, 678 F. Supp. 3d 1321, 1325 (D.N.M. 2023). Accordingly, the district court awarded Plaintiff the same amount as incidental damages under § 55-2-708(2) of the Uniform

---

[12] Plaintiff set the hedge price at $0.02 less than Supply Contract's fixed price, guaranteeing itself $0.02 profit on every gallon of gasoline Plaintiff sold Defendant. Davidson Oil Co. v. City of Albuquerque, 678 F. Supp. 3d 1321, 1324 (D.N.M. 2023).

[13] The hedge contracts required Plaintiff and its hedge partner to "settle" their financial obligations at the end of each one-month contract. Davidson Oil Co., 678 F. Supp. 3d at 1324. Because fuel's market prices were below the hedge prices during seven of the one-month hedge contracts, Plaintiff paid its hedge partner $1,226,356.65 for the hedge contracts. Id. at 1325. But once the oil market recovered, Plaintiff's hedge partner paid Plaintiff $624,497.66 during the remaining five, one-month hedge contracts, offsetting Plaintiff's total hedge losses to $601,858.99. Id.

Commercial Code ("UCC").[14]  Id. at 1331–32 (citing N.M. Stat. Ann. § 55-2-708(2) (West 1961)).

## B.

Defendant argues that, as a matter of law, Plaintiff cannot recover for hedge-contract losses under § 55-2-708(2).  As the parties concede, the UCC governs the Supply Contract.[15]  See N.M. Stat. Ann. § 55-2-106(1).

The UCC provides two categories of monetary damages relevant to this appeal:

- *Incidental damages*—"any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."  Id. § 55-2-710.

- *Consequential damages*—"any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise."  Id. § 55-2-715(2)(a).

---

[14] The district court also awarded Plaintiff damages for lost profits, but Defendant does not appeal this award.  See Davidson Oil Co., 678 F. Supp. 3d at 1332.

[15] New Mexico has adopted the UCC.  See Badilla v. Wal-Mart Stores E. Inc., 357 P.3d 936, 939 (N.M. 2015) (citing N.M. Stat. Ann. §§ 55-1-101 to 55-12-111 (West 1961, as amended through 2013)).

But one of these is not like the other: a court may award a seller incidental damages, but not consequential damages, under § 55-2-708. <u>Compare</u> <u>id.</u> § 55-2-715 (providing that a buyer may recover both "incidental and consequential damages") <u>with</u> <u>id.</u> § 55-2-708 (omitting consequential damages from those available to a seller); <u>accord</u> <u>Cass, Inc. v. Prod. Pattern and Foundry Co.</u>, 92 UCC Rep. Serv. 2d (West) 263 (D. Nev. 2017) (citing <u>Associated Metals & Mins. Corp. v. Sharon Steel Corp.</u>, 590 F. Supp. 18, 21 (S.D.N.Y. 1983)) ("It is . . . well settled that the UCC does not provide the remedy of consequential damages for aggrieved sellers.").

Defendant thus argues that the district court erred by awarding compensation for Plaintiff's hedge losses because hedge losses are consequential damages. We hold that courts may categorize hedge losses as incidental damages under § 55-2-710, and hedge losses are therefore recoverable under § 55-2-708.

1.

Section 55-2-710 requires a tripartite analysis. First, incidental damages can arise only from "charges, expenses or commissions."[16] N.M. Stat. Ann. § 55-2-710 (West 1961). We hold that Plaintiff's hedge losses arise from both charges and expenses.

The term "charge" encompasses "pecuniary burden[s]"; sums as "fee or payment"; and "expense[s], debt[s], obligation[s], or liability[ies]" against another

---

[16] We note that Defendant has failed to identify, and we have not found, a single case in which any court has determined that a payment is not a charge, expense, or commission.

party.  Charge, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961).  Here there is no reasonable contest: Plaintiff bore a pecuniary obligation to its hedge partner, and Plaintiff satisfied its debt through payment.[17]  Davidson Oil Co., 678 F. Supp. 3d at 1324, 1329–30.

Similarly, "expense" includes "financial burden[s] involved typically in a course of action,"[18]  and "item[s] of outlay incurred in the operation of a business enterprise allocable to and chargeable against revenue for a specific period." Expense, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961).  Plaintiff incurred a financial burden in fulfilling the Supply Contract, and because "[Plaintiff] entered into the hedge contracts only because of its contract with [Defendant]," any financial detriment from the hedge contracts would be chargeable against revenue collected through the Supply Contracts.  Davidson Oil Co., 678 F. Supp. 3d at 1331 (emphasis removed).  Using the plain meaning of these terms, we hold that Plaintiff's hedge losses are both charges and expenses within § 55-2-710.

Defendant presents two arguments to the contrary.  First, Defendant argues that Plaintiff's hedge losses fall beyond "charges, expenses or commissions" because

---

[17] The record shows—and Defendant does not contest—that Plaintiff borrowed $1,000,000 from Amarillo National Bank to ensure it could pay its financial obligations under the hedge contracts.

[18] This definition of "expense" queries whether the burden was "involved typically" in the course of the action.  In this case, this requirement is synonymous with the "commercially reasonable" language of § 55-2-710.  Accordingly, section III(B)(2) below contains our pertinent reasoning.

19

they "result[] from third-party transactions." This argument is nondeterminative[19] and requires a non-textual reading of § 55-2-710; we decline to read a prohibition on third-party transactions into the statute.

Nor could we categorically exclude third-party transactions from incidental damages without contradicting the UCC. True—losses arising from third-party transactions *may* give rise to consequential damages. See, e.g., Jelen & Son, Inc. v. Bandimere, 801 P.2d 1182, 1186 (Colo. 1990). But incidental damages may *also* spawn from third-party transactions. For example, in Elephant Butte Resort Marina, Inc. v. Wooldridge, 694 P.2d 1351, 1357 (N.M. 1985), the New Mexico Supreme Court resolved a dispute over a boat-purchase contract, holding that incidental damages under § 55-2-710 encompassed the cost of boat insurance paid by the seller after the defendant's repudiation of the contract. Comparably, in Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co., 697 F.2d 481, 484 (2d. Cir. 1983), the Second Circuit held that the plaintiff's interest payments to a third-party financier were incidental damages. Similarly, multiple courts have interpreted the UCC's incidental damages provision to encompass commissions paid on the resale of goods for which a buyer originally contracted—compensating the plaintiffs for payments to third parties. See, e.g., Berg v. Hogan, 322 N.W.2d 448, 453–54 (N.D. 1982); Peoria Harbor Marina v. McGlasson, 434 N.E.2d 786, 792 (Ill. App. Ct. 1982).

---

[19] Defendant has not explained why a payment should no longer qualify as a charge, expense, or commission simply because the recipient was not a party to the breached contract.

Defendant also argues that hedge losses are "losses" rather than "charges, expenses, or commissions." But this argument confuses ends with means. Section 55-2-708(2) guarantees Plaintiff an end: damages as compensation for financial loss, sufficient "to put the seller in as good a position as performance would have done." A plaintiff who has lost nothing is not entitled to damages under § 55-2-708. But in *calculating* damages, § 55-2-710 only provides incidental damages for losses "incurred" by certain means: "charges, expenses or commissions." So to say that Plaintiff seeks compensation for "losses" does not answer the pertinent inquiry under § 55-2-710, and we hold that Plaintiff incurred its hedge losses by charges and expenses.

2.

Incidental damages can arise only from charges, expenses, and commissions that are "commercially reasonable." N.M. Stat. Ann. § 55-2-710. Defendant does not argue that the hedge contracts were not commercially reasonable. And for good reason: hedge contracts are a well-established tool by which a commodity seller may "insure[] itself against unfavorable changes in the price." Ralston Purina Co. v. McFarland, 550 F.2d 967, 970 (4th Cir. 1977); accord Bd. of Trade v. L.A. Kinsey Co., 130 F. 507, 512 (7th Cir. 1904), aff'd sub nom. Bd. of Trade v. Christie Grain & Stock Co., 198 U.S. 236 (1905) ("[H]edging is a manufacturer's or merchant's insurance against price fluctuation of materials, and no more damnatory than insurances of property and life, which in one sense are wagers that the property will not be destroyed during the term, and that the life will not fail in less than the

21

expectancy in the actuaries' tables."). Even the Supreme Court has recognized the commonness of hedging contracts. See Brown v. Thorn, 260 U.S. 137, 139–40 (1922); Lamson Bros. & Co. v. Turner, 277 F. 680, 684 (8th Cir. 1921) (citing Christie Grain & Stock Co., 198 U.S. at 249) ("hedging . . . is a common and lawful practice").

Further, Defendant personally acknowledged the commercial reasonableness of Plaintiff's hedge contracts. Defendant directed all potential bidders to "have its supplies already hedged . . . or the ability to hedge." On this basis, the district court found Defendant "expressly contemplated" that Plaintiff would hedge its Supply Contract position. Davidson Oil Co, 678 F. Supp. 3d at 1331. By expressly contemplating that Plaintiff would hedge, Defendant demonstrated that it believed hedging the Supply Contract was commercially reasonable. We therefore hold that Plaintiff's hedge losses arose from "commercially reasonable" charges and expenses. N.M. Stat. Ann. § 55-2-710.

### 3.

Lastly, incidental damages are limited to losses "incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." Id. We hold that Plaintiff's hedge losses are those "otherwise resulting from the breach." Id.

According to our precedent, the pertinent inquiry of § 55-2-710 is whether the losses were "reasonably incurred as a result of [Defendant]'s breach." Bill's Coal

22

Co. v. Bd. of Pub. Utils., 887 F.2d 242, 246 (10th Cir. 1989). Because our precedent provides a holistic, fact-bound inquiry, we must avoid converting this standard into an inflexible rule, instead examining any relevant factors that speak to how reasonably and directly the loss resulted from the breach.[20] Cf. id. In this case, three factors persuade us that Plaintiff's hedge losses reasonably and directly resulted from Defendant's breach. First, we are persuaded by Defendant's knowledge and intent. As discussed above, when Defendant solicited and signed the Supply Contract, Defendant knew that Plaintiff would hedge its position because Defendant encouraged Plaintiff to do so. Davidson Oil Co, 678 F. Supp. 3d at 1331. So Defendant breached the Supply Contract with knowledge that Plaintiff possessed an outstanding financial obligation to a third party.

---

[20] Rules and standards differ in the type of direction they give. A rule operates on a sufficient condition, providing a specific result of a factual predicate: e.g., the state will assess a fine against drivers exceeding seventy-five miles per hour. N.M. Stat. Ann. § 66-7-301(A)(4) (West. 1978). In contrast, a standard requires the adjudicator to holistically apply a governing principle: e.g., the state will assess a fine against drivers who do not control their speed as necessary to protect workers in construction zones. Id. § 66-7-301(B)(3). Standards evade error by permitting "all relevant factors to be considered" in applying facts to principle. See Eric A. Posner & Adrian Vermeule, Constitutional Showdowns, 156 U. PA. L. REV. 991, 1017 (2008). But Judges may prefer rules because they "minimize decision costs" by allowing the adjudicator to account only for the factual predicates of the rule. Id. This predilection may tempt adjudicators to fashion rules out of standards, but we must deny this temptation. See Ronald M. Dworkin, The Model of Rules, 35 U. CHI. L. REV. 14, 25–29 (1967). Where the law obligates us to evaluate whether losses were "reasonably incurred as a result of [Defendant]'s breach," we must do so holistically, examining any factors that speak to the reasonableness and directness of the cause. Bill's Coal, 887 F.2d at 246.

23

Second, we are persuaded by the nature of hedging. In the performance of a requirements contract, both the seller and the buyer benefit from the supplier hedging. A seller limits its risk exposure by hedging, but a buyer also limits its risk exposure by contracting with a hedged supplier: its supplier will remain solvent—and therefore able to deliver the commodity—despite market fluctuations. Perhaps this explains why Defendant specifically told potential bidders to "have its supplies already hedged . . . or the ability to hedge." In other words, Defendant's breach more reasonably and directly caused Plaintiff's hedge losses because Plaintiff knew it stood to benefit from the hedge contracts under the Supply Contract's full performance.

Finally, we are persuaded by language of § 55-2-708(2) which instructs courts "to put the seller in as good a position as performance would have done." If we held—as Defendant argues—that hedge losses are not incidental damages, we would circumnavigate this instruction, stranding Plaintiff with a deficient value. In combination, these factors persuade us that Plaintiff's hedge losses were reasonable and direct enough to have "otherwise result[ed] from the breach" within the meaning of § 55-2-710.[21]

Defendant argues that the phrase "otherwise resulting from the breach" only encompasses charges, expenses, and commissions incurred after the breach. But

---

[21] Although sufficient here, these considerations are not necessary: different—or fewer—factors may guide our judgment in future cases.

Defendant's position is unpersuasive.  First, Defendant lacks the factual predicate for this argument: Plaintiff incurred the hedge losses after the breach.[22]  Second, even though Plaintiff signed its hedge contracts before Defendant's breach, the same can be said of insurance policies, and the New Mexico Supreme Court permits sellers to recover payments on insurance policies as incidental damages.  Wooldridge, 694 P.2d at 1357.  Finally, formulaic application of Plaintiff's proposed primacy rule would usurp the fundamental directive of incidental damages: to recompense a seller for losses "reasonably incurred as a result of the buyer's breach."  Bill's Coal, 887 F.2d at 246.  This directive does not query sequence, but reasonableness and directness of the breach to the injury; whatever the sequence, the losses reasonably incurred by a buyer's breach are collectable as incidental damages.  Id.

---

[22] As the district court noted, Plaintiff's hedge contracts required Plaintiff to settle its financial obligations with its hedge partner "at the end of each one[-]month contract" which covered each month of the Supply Contract.  Davidson Oil Co., 678 F. Supp. 3d at 1324.  Because Defendant breached the Supply Contract before the first hedge contract, Plaintiff made every hedge contract payment after the breach. Id.  Given that Plaintiff's financial obligations under each month's hedge contract could not even be *calculated* until the end of each contract, we cannot reasonably interpret Plaintiff's hedge losses as incurring before the breach.

We thus hold that the hedge losses at issue in this case are commercially reasonable charges and expenses otherwise resulting from the breach—incidental damages within § 55-2-710, for which Plaintiff may recover under § 55-2-708(2).[23]

AFFIRMED.

---

[23] The district court awarded Plaintiff $601,858.99 in incidental damages—the total of Plaintiff's hedge losses. Davidson Oil Co., 678 F. Supp. 3d at 1331. Defendant did not argue on appeal that any portion of Plaintiff's hedge losses did not result from the breach. So we need not—and therefore do not—decide whether the district court correctly awarded all of Plaintiff's hedge losses as incidental damages.